**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------------------X
ALLSTATE INSURANCE COMPANY, ALLSTATE
INDEMNITY COMPANY, ALLSTATE PROPERTY &
CASUALTY INSURANCE COMPANY, and ALLSTATE
FIRE & CASUALTY INSURANCE COMPANY,

                     Plaintiffs,                                  Index No.

            -against-                                 23-CV-8070

MARK H. VINE, MD,
SERGEY ALEKSEYEVICH KALITENKO, MD,
SOORAJ NITIN POONAWALA, DO,
 ERIC W. KENWORTHY, MD,                         **COMPLAINT**
 ELENA BORISOVNA STYBEL, DO,
GRACE MEDICAL HEALTH PROVIDER P.C.,
HEADLAM MEDICAL PROFESSIONAL CORPORATION,
SERGEY A. KALITENKO, PHYSICIAN, P.C.,
YANA MIRONOVICH,
NEW YORK BILLING AND PROCESSING CORP.,
JOHN DOES 1-6, AND ABC CORPS. 1-6,

                   Defendants.
------------------------------------------------------------------------------------X

## <u>TABLE OF CONTENTS</u>

Background and Introduction ................................................................................................3

The Parties ..........................................................................................................................11

Jurisdiction and Venue........................................................................................................15

I.      The Defendants' Fraudulent Schemes Were
        Enabled by Professional Licensing Violations ................................................16

II.     The Defendants' Billing for Shockwave was Fraudulent ..................................18

III.    The Defendants' Fraudulent Scheme to Bill for Transcranial Doppler Testing ...............35

IV.     The Defendants' Fraudulent Scheme to Bill for Vestibular Testing ................................43

V.      The Provider Defendants' Interchangeable Use in the Scheme........................................49

VI.     The Defendants' Awareness of the Illegality of Their Conduct .......................................51

VII.    The Defendant Kalitenko MD's Failure to Verify Claims ................................................60

VIII.   The Defendants' Fraudulent Scheme to Bill
        in Violation of the Fee Schedule................................................................61

IX.     The Defendants' Fraudulent Scheme to Bill
        for Services Rendered by Independent Contractors...........................................61

X.      The Defendants' Fraudulent Scheme was Enabled
        by Illegal Referrals of Patients........................................................................64

FIRST CLAIM FOR RELIEF .............................................................................................65

SECOND CLAIM FOR RELIEF .........................................................................................69

THIRD CLAIM FOR RELIEF ............................................................................................70

FOURTH CLAIM FOR RELIEF ........................................................................................74

FIFTH CLAIM FOR RELIEF .............................................................................................76

SIXTH CLAIM FOR RELIEF.............................................................................................78

SEVENTH CLAIM FOR RELIEF ......................................................................................80

The Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire &Casualty Insurance Company ("Plaintiffs" or, collectively, "Allstate"), by and through their attorneys, Short & Billy, P.C, and Bruno, Gerbino, Soriano & Aitken, LLP, for their Complaint in this action, hereby allege as follows:

## BACKGROUND AND INTRODUCTION

1. The State of New York has provided for No-Fault automobile insurance as a form of coverage designed to be useful to the consumer and to provide medical coverage, lost wages, and other benefits to people injured in automobile accidents so that they can recover from their injuries with minimal disruption in their lives.  For approximately twenty years, commencing with its inception in 1974, the No-Fault system functioned to the benefit of the consumer at premiums that were generally affordable.

2. Since the mid-1990s, however, New York's No-Fault coverage has been targeted by perpetrators of fraud.  An increasingly large number of such persons have gone into business with the purpose of abusively billing the New York No-Fault system.  The New York Court of Appeals has commented that the No-Fault system has been targeted by and is plagued by fraud. As the Court of Appeals explained in *Matter of Medical Society of New York v. Serio*, that fraud has included staged accidents, billing for unnecessary services, and organized crime involvement.  100 N.Y.2d 854 (2003).

3. As the New York State Department of Financial Services (formerly the New York State Insurance Department) ("DFS") explained in its March 15, 2016 Health Care Insurance Fraud Report to the Governor, health care fraud has serious adverse impacts on patients/consumers, insurers, and the public. This fraud includes medical providers that bill for services that were not provided or that were unnecessary, and it constituted the majority of all

3

health care fraud in New York. The 2016 Report noted that insurers are required to investigate fraud and to have a plan for the investigation and initiation of civil actions. Even in 2016, DFS reported that No-Fault insurance fraud cost the public in New York "hundreds of millions of dollars" in insurance costs.

4.   The problem has persisted in New York and across the country, as set forth in the March 15, 2023 DFS Report titled "Investigating and Combating Health Insurance Fraud," which called it a "costly and pervasive drain on the national healthcare system." The 2023 Report cites an estimate of the National Health Care Anti-Fraud Association that "losses due to healthcare fraud are in the tens of billions of dollars each year," and No-Fault fraud has accounted for the vast majority of those losses in New York.  Indeed, DFS found that reports of suspected No-Fault fraud "accounted for 93% of all healthcare fraud reports received in 2022 and at least 90% of all healthcare fraud reports received since 2018." In fact, No-Fault fraud reports "accounted for 73% of all fraud reports," including suspected non-healthcare fraud, received by DFS during 2022. The 2023 Report also reiterated the requirement that insurers engage in fraud detection activities, including by a full-time Special Investigations Unit (SIU), and that they plan for the investigation and initiation of civil actions.

5.   Pursuant to its obligations under Article 4 of the New York Insurance Law, Allstate has filed this action to remedy a pattern of serious fraud that has a significant impact on the public, consumers, and itself.

6.   The abusive practices set forth herein not only drive up the cost of insurance; they also place in peril the quality of health care available to the public.  The Defendants consist of a group of doctors, laypersons, and medical provider entities that have worked in concert to submit inflated and fraudulent claims to Allstate.  In many cases, they have billed for fictitious services

4

that were never rendered as billed, and/or for services that have been rendered incompetently and/or without regard to the welfare of the patients. All of the Defendants have billed abusively and/or assisted in the abusive billing. Many of the claims were for services that were not only unnecessary, but which also placed the patients at unnecessary risk.

7. The No-Fault system is designed to provide compensation for health care expenses and to process claims quickly. As a consequence, the submission of bills for facially valid services will often result in a payment from a No-Fault insurer. The Defendants have taken advantage of this feature of the No-Fault system in order to submit and receive payment for fraudulent billing. In this regard, the Defendants' practices have been relentless.

8. In a field that is permeated with fraud, the scheme perpetrated in this case is one of the most egregious. Laypersons provided the services, to the extent any were actually provided, and the services were then billed for in the names and licenses of the medical providers. One of the managers of the layperson "technicians" who provided these services testified at a deposition that his training consisted of forty minutes of watching a lecture online. He then proceeded to hire and train other laypersons to provide the services. These laypersons could have been unemployed or working in jobs totally unrelated to health care until they got the call. Then they were transformed into purported providers of health care services. This technician testified that the Defendant Yana Mironovich told him and the other laypersons which clinics to travel to for the administration of shockwave treatment. They did not know in what doctor's name the services were billed, nor did they meet the doctors. According to this technician, it took between five and seven minutes to administer the shockwave treatment, which was then billed under No-Fault for approximately $2,000.

9.  To the extent these laypersons were providing diagnoses and health care which were billed as medical services, they were illegally practicing medicine and/or audiology.  The health provider Defendants and Mironovich enabled the unauthorized practice.  In the words of the second layperson technician manager who testified at a deposition, he brought "stacks of reports" to Mironovich, and she paid him for those reports.  The unauthorized practice of a profession is a felony, and aiding and abetting three or more persons in their unlawful practice is a felony pursuant to Education Law §6512.

10.  The flow of patients for the scheme was enabled by the payment of kickbacks to the referring providers, which occupied the many clinical locations where the scheme's fraudulent services were purportedly rendered.

11.  Mironovich directed the flow of laypersons providing the services and the disposition of the money received at multiple referring providers' clinics.  She repeatedly directed that some of the money be paid to entities that then sought to hide the money.  In a case filed by GEICO, it produced a record of payments from these entities to a jeweler who helped convert these funds into untraceable gold bullion.

12.  Not only were unnecessary services provided and fraudulent billing submitted, the services provided by the laypersons masquerading as health care providers could have harmed the patients.  In numerous bills the symptoms of the patients included brain injuries.  Repeatedly, transient cerebral ischemic attacks were diagnosed.  If the patients had actually presented with such conditions, they would have needed treatment, rather than being used as pawns in this fraudulent billing scheme in which such injuries were ignored and not treated.

13.  The Defendants have engaged in patterns of receiving referrals for, and/or billing for, unnecessary services.  In claim after claim, unnecessary services have been repeatedly billed to

the Plaintiffs by the Defendants.  They have engaged in an illegal referral network in which the patients were referred not by need, but in order to enrich the Defendants.

14. The referral network is an elaborate system of interrelated persons and entities.  The nature and degree of these relationships, some or all of which are undisclosed to patients, are illegal under New York law.

15. The Defendants have repeatedly submitted billing for services allegedly rendered by physicians, including the health provider Defendants and their owners, who did not actually provide the services billed and in many cases did not even meet with patients.

16. The health provider Defendants, consisting of physicians and professional corporations nominally owned by physicians, did not provide the services that were billed in their names.  The claims' representations that the services were provided by physicians are completely fraudulent, and the billing in the doctors' names is for fictitious services not rendered as billed.

17. In actuality the services either were not provided at all or they were provided by laypersons who were not licensed as health providers and had no business purporting to treat patients who had allegedly been injured and in need of healthcare services and/or were not provided as represented by the Defendant health providers.  Mironovich and the Defendants New York Billing & Processing Corp., John Does 1-3, and ABC Corps 1-3 provided the persons including laypersons who actually administered any purported health care services that were provided.

18. Another insurer has sued several of the Defendants in this case including Mironovich and NY Billing.  Mironovich has repeatedly pleaded the Fifth Amendment in response to discovery requests, and NY Billing has defaulted and has not challenged the allegations against

them.  The Defendants Kalitenko MD and Stybel have also invoked the Fifth Amendment in response to discovery requests.

19.  All of the Defendants in this case either billed or facilitated billing for extracorporeal shockwave and/or radial pressure wave (collectively, "shockwave") therapy.  In addition, billing submitted on behalf of five of the Defendants has also included Doppler testing of the arteries in the brain (TCD, as further defined herein), as well as testing of the vestibular system through examinations of the eye and ear using specialized equipment.

20.  Shockwave has shown utility in the treatment of urinary stones. The "shockwave" delivered to the patient is sufficiently strong to mechanically break up urinary stones into smaller stones that can be passed down the urinary tract and out of the body.  The Defendants in this case, however, did not administer it to any patients for the treatment of urinary stones.

21.  The efficacy of shockwave outside the field of urology, and specifically to treat musculoskeletal conditions as the Defendants have purportedly done, is unproven and is not generally accepted as a standard of care for the treatment of such conditions.

22.  Moreover, the Defendants perpetrated a scheme in which laypersons administered shockwave to patients, despite misrepresenting in their reports and bills that the services were rendered by the health provider Defendants who are licensed physicians.  The patients' care was entrusted to the managers of the scheme including the Defendants Mironovich, NY Billing, John Does 1-6, and ABC Corps 1-6.  These managers hired personnel, including laypersons, to administer the services.  The managers then generated bills in the names of the provider Defendants, falsely representing that the services had been provided by physicians, and they arranged for the bills to be submitted to Allstate.

23. The complicit referring providers knew or should have known that the laypersons masquerading as doctors could provide no services of value to their patients, and that there was no possible benefit to the patients in the administration of the shockwave services as billed or as provided, if at all.

24. Essentially the same paperwork and the same claims of injury were submitted for patient after patient after patient.

25. In order to avoid detection of this fraud, the managers and others changed the health care providers in whose name the billing was submitted and replaced them with other health care providers after a few months.

26. This billing for shockwave was a complete and total scam. It has no proven utility and is considered experimental for musculoskeletal injuries. It was billed too early in the treatment of the patients, and without any indication in the medical records of any need or utility.

27. As outrageous as the shockwave billing scheme has been, the billing submitted to Allstate on behalf of certain of the provider Defendants for Doppler and vestibular testing has been in some respects even worse. The Defendants' fraud in the provision of these services has an even greater potential to adversely impact their patients' health and well-being.

28. Billing has been submitted in the names of the provider Defendants Vine, Poonawala, Kalitenko MD, Grace, and Headlam PC for Doppler (TCD), and for vestibular testing, including videonystagmography (VNG). This billing was completely fraudulent. None of these Defendants or their physician owners provided any such testing. If any testing was administered at all, it was administered by laypersons who were not permitted to practice medicine and/or audiology. Phony diagnoses were submitted. Sham reports were generated. If any patient had actually presented with a condition that warranted such testing, and if these sham

and fraudulent reports been relied upon by another provider, it could have seriously jeopardized the patient's health.

29. Included in the billing and reports submitted to Allstate were data tables and graphics ("waveforms") purportedly depicting a patient's unique TCD testing results. The nature and complexity of TCD testing make it extremely unlikely that any two patients would have the same test results. In some cases, however, these Defendants' reports contained data and waveforms which were identical to those of other patients.

30. The Defendants' practices are against the interests of the very patients/assignors they purport to treat. Inflating billing for unnecessary and fictitious services depletes the patients' $50,000 accident coverage limits, reducing what would be left for other expenses including lost wages. The billing for Doppler and audiology services included phony diagnoses that could have impacted patient care if relied upon. As such, the fraudulent practices of the Defendants have gone not only against the interests of the consumer and the general public, but also against the interests of the very patients/assignors these Defendants claim to be treating and/or testing. The Defendants engaged in a brazen scheme that is tantamount to an assault against the medical and financial well-being of patients, premium-paying consumers, insurers including the Plaintiffs, and the public of the State of New York at large.

31. The Defendants have engaged in a massive fraudulent scheme and have been paid during the six (6) years preceding this Complaint an amount totaling at least $1,185,299.17 by the Plaintiffs alone, on No-Fault bills submitted by the Defendants to Allstate totaling at least $4,457,222.22.

32. This action is to recover payments made by Allstate to the Defendants for No-Fault claims that were intentionally misrepresented, medically unnecessary, submitted pursuant to an

improper referral arrangement, and/or never rendered as billed. The Plaintiffs also seek a declaratory judgment that they are not required to pay any No-Fault claims of the Defendants because of their improper licensing, ownership and/or billing practices, and because the billed-for services are the product of illegal self-referrals.

33.  As a result of the Defendants' actions alleged herein, the Plaintiffs were defrauded in an amount totaling at least $1,185,299.17, the exact amount to be determined at trial, in payments which the Defendants received for fraudulent and improper billing. The Plaintiffs seek to recover the payments they have made for services that the Defendants never rendered, that they were not entitled to bill for, and/or that they knew or should have known were not medically necessary or were so improperly performed as to be useless and of no value. The Plaintiffs also seek a declaration that that they are not required or obligated to pay for No-Fault claims submitted by the Defendants.

## The Parties

**Plaintiffs**

34.  The Plaintiff Allstate Insurance Company is a corporation organized under the laws of the State of Illinois and is authorized to conduct business in the State of New York. Allstate Insurance Company maintains offices in the State of New York including an office in Nassau County.

35.  The Plaintiff Allstate Indemnity Company is a corporation organized under the laws of the State of Illinois and is authorized to conduct business in the State of New York. Allstate Indemnity Company maintains offices in the State of New York including an office in Nassau County.

36.  The Plaintiff Allstate Fire & Casualty Insurance Company is a corporation organized under the laws of the State of Illinois and is authorized to conduct business in the State of

New York. Allstate Fire & Casualty Insurance Company maintains offices in the State of New York including an office in Nassau County.

37. The Plaintiff Allstate Property & Casualty Insurance Company is a corporation organized under the laws of the State of Illinois and is authorized to conduct business in the State of New York. Allstate Fire & Casualty Insurance Company maintains offices in the State of New York including an office in Nassau County.

38. The Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company and Allstate Property & Casualty Insurance Company are referred to herein as the "Plaintiffs" or, collectively, "Allstate."

**Individual Defendants**

39. The Defendant Sergey Alekseyevich Kalitenko, MD ("Kalitenko MD") is a resident of the State of New York and is licensed by the State of New York to practice the profession of medicine.

40. The Defendant Sooraj Nitin Poonawala, DO ("Poonawala") is a resident of the State of New York and is licensed by the State of New York to practice the profession of medicine.

41. The Defendant Mark H. Vine, MD ("Vine") is a resident of the State of New York and is licensed by the State of New York to practice the profession of medicine. Vine was also licensed by the State of New Jersey to practice the profession of medicine, but his license has expired and is pending reinstatement.

42. The Defendant Elena Borisovna Stybel, DO ("Stybel") is a resident of the State of New York and is licensed by the State of New York to practice the profession of medicine.

43. The Defendant Eric W. Kenworthy, MD ("Kenworthy") is a resident of the State of New York and is licensed by the State of New York to practice the profession of medicine.

44. The Defendant Yana Mironovich ("Mironovich)") is a resident of the State of New York.

**Entity Defendants**

45. The Defendant Grace Medical Health Provider P.C. ("Grace") is a professional corporation ("PC") organized under the laws of the State of New York and is or was nominally owned by non-party Opeoluwa Oluwabusuyi Eleyinafe, MD ("Eleyinafe").   Grace was incorporated in New York on May 6, 2021.

46. The Defendant Headlam Medical P.C. ("Headlam PC") is a professional corporation organized under the laws of the State of New York and is nominally owned by non-party Bo Tyler Headlam, MD ("Headlam MD").  Headlam PC was incorporated in New York on January 25, 2017.

47. The Defendant New York Billing and Processing Corp. ("NY Billing") is a corporation organized under the laws of the State of New York and is owned by Mironovich. NY Billing was incorporated in New York on April 25, 2017.

48. The Defendant Sergey A. Kalitenko, Physician, P.C. ("Kalitenko PC") is a corporation organized under the laws of the State of New York and is nominally owned by the Defendant Kalitenko MD.  Kalitenko PC was incorporated in New York on October 10, 2001. At times herein, Kalitenko PC and Kalitenko MD are referred to together as "Kalitenko."

49. The Defendants Grace, Headlam PC, and Kalitenko PC are referred to herein as the "Defendant PCs."

**ABC Corporations and John Doe Defendants**

50. ABC Corps. 1-3 are additional entities, including management companies, billing companies, and/or attorneys whose names are not yet known to Allstate, that are not owned in the name of licensed health providers, that contracted with one or more of the Defendants to provide management and/or billing services, and/or that made improper referrals and conspired to and did assist in the fraudulent and unlawful conduct alleged in this Complaint. These entities will be added as Defendants when their names and the extent of their participation become known through discovery.

51. ABC Corps. 4-6 are additional entities, whose names are not yet known to Allstate, that are owned in the name of licensed health providers, that contracted with one or more of the Defendants, and/or that made improper referrals and conspired to and did assist in the fraudulent and unlawful conduct alleged in this Complaint. These entities will be added as Defendants when their names and the extent of their participation become known through discovery.

52. John Does 1-3 are additional individuals, whose names are not yet known to Allstate, who are true owners of one or more of the Defendants, who contracted with one or more of the Defendants to provide management and/or billing services, and/or who made improper referrals and conspired to and did assist in the fraudulent and unlawful conduct alleged in this Complaint. These individuals will be added as Defendants when their names and the extent of their participation become known through discovery.

53. John Does 4-6 are additional individuals, whose names are not yet known to Allstate, who are licensed as health providers in the State of New York, and who made improper referrals and conspired to and did assist in the fraudulent and unlawful conduct alleged in this Complaint.

These individuals will be added as Defendants when their names and the extent of their participation become known through discovery.

54.  John Does 1-3 and ABC Corps. 1-3 are referred to herein as the "John Doe layperson Defendants".  John Does 4-6 and ABC Corps. 4-6 are referred to herein as the "John Doe health provider Defendants."

## Jurisdiction and Venue

55.  Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331 [Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et. seq.*] and 28 U.S.C. § 1332 (diversity of citizenship).

56.  Supplemental jurisdiction over Allstate's state law claims is proper pursuant to 28 U.S.C. § 1367.

57.  Whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York, venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

58.  Each of the Defendant health providers have conducted business in the State of New York during the relevant time period by (a) operating from clinics or other facilities located in New York, and (b) billing for medical services in connection with New York claimants under New York No-Fault insurance policies issued by Allstate.

59.  The Defendants have therefore engaged in purposeful activities in New York by conducting business in New York, and by seeking and collecting payments under New York's No-Fault laws.

60.  The Defendants' activities in and contacts with New York were purposely sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

I.      **The Defendants' Fraudulent Schemes Were**
        **Enabled by Professional Licensing Violations**

61.  In order to protect the public, the State of New York has created extensive licensing regulations for health care professionals and entities.  The Defendants in this case have engaged in numerous violations of these requirements in order to perpetrate and conceal their extensive fraudulent conduct and illegal financial and referral relationships.  The Defendants submitted fraudulent and abusive billing to the Plaintiffs for payment under the No-Fault insurance program. The Defendants have made numerous misrepresentations as to their proper license and its scope, including misrepresentations as to the ownership and control of the Defendant health providers and including misrepresentations of the licenses of the persons who provided the services.

62. A proper license and providing service within the scope of that license is a prerequisite to payment under the No-Fault program.

63. The State of New York regulates the practice of medicine and the practice of other professions. It restricts the practice of medicine and the ownership of medical professional corporations to licensed physicians. The State does so in order to protect consumers and the public health. Only licensed physicians, subject to the regulation and oversight of the State, are permitted to practice medicine. The only professional corporations permitted to provide physician medical services are professional corporations which are owned exclusively by physicians. The use of the title "physician" or "surgeon" by one who is not a physician is prohibited. The practice of medicine by one who is not a physician is a felony pursuant to Education Law §6512. The sale of a medical license is also a felony under Education Law § 6512. This statutory framework is designed to protect the public and ensure that medical

16

services are provided by licensed physicians. The State of New Jersey has similar requirements and protections.

64. The Defendant health providers did not control or oversee the billing in their names and under their licenses that was submitted in the fraudulent scheme. The Defendant PCs and the individual physician Defendants permitted the Defendant laypersons, including the John Doe layperson Defendants, to control the use of their licenses and billing.

65. On paper, the Defendant PCs Grace, Headlam PC, and Kalitenko PC have been owned by Eleyinafe, Headlam MD, and Kalitenko MD, respectively. This ownership has been fraudulent. These doctors did not own and control these Defendant PCs or their billing.

66. This sham ownership has enabled the layperson Defendants to engage in fraudulent billing.

67. For the protection of patients, New York requires that only professionals provide professional services. In the Defendants' scheme, laypersons provided the services to the extent any were actually provided, and they were then billed in the names and licenses of the Defendant medical providers. The medical provider Defendants were not involved in the providing of the services. One of the managers of the laypersons who provided the services testified at a deposition in *GEICO v Stybel* that his training consisted of forty minutes of watching a lecture online. He then proceeded to hire and train other laypersons to provide the services. These laypersons could have been unemployed or working in totally unrelated jobs until they got the call. Then they were transformed into providing health care services. This technician testified that the Defendant Mironovich told him and the other laypersons which clinics to travel to and administer shockwave treatment. They did not know in what physician's name the services were billed, nor did they meet those doctors.

68.  To the extent these laypersons were providing diagnoses and health care which was billed as medical services, they were illegally practicing medicine and/or audiology.  The health provider Defendants, Mironovich, and NY Billing enabled the unauthorized practice.  The unauthorized practice of a profession is a felony, and aiding and abetting three or more persons in their unlawful practice is a felony pursuant to Education Law §6512.

69.  The DFS Regulations provide that to be compensated under No-Fault, professional health services must be provided by a licensed provider within the scope of his or her license.  See 11 N.Y.C.R.R. §§65-3.16(a)(6) & (12).  To the extent the Defendants have billed Allstate for services provided by laypersons, they are not compensable.  To the extent that the Defendants represented that the services were provided by the provider Defendants or their owners who are physicians, these representations were fraudulent.

## II.   **The Defendants' Billing for Shockwave Was Fraudulent**

### A.   **Background and Summary of Shockwave Scheme**

70. In or about 2021, the Defendants developed an unlawful scheme to bill for shockwave treatment after changes were adopted by the New York Department of Financial Services and the New York Workers' Compensation Board regarding the New York Workers Compensation Fee Schedule ("Fee Schedule") applicable to New York's No-Fault reimbursement.

71. The Fee Schedule established a rate of reimbursement for performance of extracorporeal shockwave therapy ("shockwave"), which had historically been a Category III Code (0101T) with a "BR" or "by report" designation. A numerical reimbursement had not been established prior to October 2020. While a numerical amount was set forth, the service continued

to be included as a Category III Code for experimental and unproven services.  Prior to October 2020, shockwave was virtually never performed on automobile accident patients or billed to automobile insurers.  Once the numerical value was added, this service became a magnet for the Defendants' fraud.

72. Shockwave therapy has been used with some success for decades in the field of Urology for the treatment of urinary stones. The "shockwave" delivered to the patient is sufficiently strong to mechanically break up urinary stones into smaller stones that can be passed down the urinary tract and out of the body. Likewise, extracorporeal shockwave lithotripsy is a procedure to break up stones inside the urinary tract, bile ducts or pancreatic duct with a series of shock waves generated by a machine called a lithotripter.  The shock waves enter the body and are targeted using an x-ray.

73. The Defendants never billed Allstate for breaking up urinary stones, its main value for assisting patients.  Instead, they sought to use and bill for shockwave administered to musculoskeletal injuries.  Rather than have qualified surgeons administer a surgical procedure to patients in need of such a service, they entrusted the patient's care to laypersons.  Rather than providing a service that would help the patients, they sought to bill for useless services that were not provided by the Defendant health providers and which served only to enrich the Defendants at the expense of the patients' limited insurance coverage.

74. The Centers for Medicare and Medicaid Services ("CMS") in a local coverage determination considered shockwave therapy for musculoskeletal treatment and found it to be unproven.  CMS has described it as "a non-invasive treatment that involves delivery of an acoustic shock wave to a specific area of the body. The objective of this treatment is to reduce pain and stimulate healing of the affected area. The acoustic waves travel through fluid and soft

tissue, and their effects occur at sites where there is a change in impedance, such as the bone/soft-tissue interface."   CMS has further explained that "The mechanism by which ESWT achieves a therapeutic intervention in musculoskeletal conditions is not completely known" and it has described various possibilities as "hypotheses" at this point.

75. Use of shockwave in musculoskeletal injuries is not considered the appropriate medical standard of care and remains unproven and experimental, as demonstrated by the fact that it remains a Category III code.  The use of shockwave for the treatment of back, neck, and shoulder pain is experimental and investigational in nature.

76. After an amount was included in the fee schedule for shockwave, the Defendants commenced a scheme to bill substantial charges for services that as provided were without value and were billed with numerous misrepresentations.   The health provider Defendants, the layperson Defendants and the John Doe and ABC Corp. Defendants devised a fraudulent treatment and billing scheme pursuant to which:

(i) Laypersons would allegedly render the Fraudulent Services – falsely claiming on paper that the treatment was performed by the health provider Defendants – in a variety of "clinics" located throughout the New York metropolitan area that professed to provide treatment to patients with no-fault insurance (the "Clinics");

(ii) the Defendants and the laypersons who provided the services generated fabricated reports; and

(iii) the reports, documents, and bills for thousands of dollars per patient per date of treatment would be sent to New York automobile insurance companies including Allstate, seeking payment for the performance of shockwave.

77.  In furtherance of the scheme, the Defendants took the following actions:

(i) The health provider Defendants in effect sold their names, medical licenses, and practices to the layperson, John Doe and ABC Corp. Defendants in order to bill Allstate and other New York automobile insurance companies for the alleged performance of shockwave services;

(ii) The layperson Defendants, John Doe Defendants and ABC Corp. Defendants entered into unlawful arrangements with individuals and provided false reports and billing for shockwave services allegedly provided to individuals covered by No-Fault insurance, and referred the No-Fault billing and collection tasks to New York collection lawyers;

(iii) The layperson Defendants, the John Doe Defendants, and the ABC Corp. Defendants created illegal referral and kickback arrangements with the owners and/or managers of the Clinics to provide the Defendants access to a constant flow of patients such that they could fraudulently bill Allstate and other automobile insurers; and

(iv) The Defendants cycled from one health provider to another at regular intervals to prevent insurers from discovering their scheme in time to seek timely verification.  The scheme was designed so that as soon as an insurer had questions about a health provider, that provider provided stopped billing and a new health provider commenced billing.  Billing in this case included instances where one of the provider Defendants billed for a limited period before being replaced by another provider Defendant.

78. The layperson Defendants, the John Doe Defendants, and the ABC Corp. Defendants:

(i) used the health provider Defendants' medical licenses, their tax identification numbers and electronic copies of their signatures to generate large quantities of fraudulent documents, including NF-3 forms (i.e. bills) falsely claiming that the health provider Defendants provided the shockwave treatment, assignment of benefits forms, and medical records; and

(ii) used the health provider Defendants' practices as fictional healthcare "practices" to serve as the billing vehicle through which millions of dollars of fraudulent billing for shockwave could be submitted to Allstate and other New York automobile insurers.

**B.**     **Misrepresentations that Licensed Physicians Provided the Shockwave "Treatment"**

79.  The Defendants submitted bills representing that shockwave treatment was provided by the Defendants or their owners who are physicians.  This claim was a complete sham to obscure the fact that the Defendant health providers' names and licenses were being used by laypersons to accomplish a massive billing fraud scheme.

80. One of the managers of the layperson "technicians" who provided the services testified at a deposition in *GEICO v Stybel* that his training consisted of forty minutes of watching a lecture online. He then proceeded to hire and train other laypersons to provide the services. These laypersons could have been unemployed or working in totally unrelated jobs until they got the call. Then they were transformed into providing health care services. This technician testified that the Defendant Mironovich told him and the other laypersons which clinics to travel to and administer shockwave treatment. They did not know in what physician's name the services were billed, nor did they meet those doctors. It took, according to this technician, between five and seven minutes to administer the shockwave treatment, which was then billed at $2,000. A second layperson provided similar testimony as to the Defendant Mironovich's direction of the scheme and testified that he brought "stacks of reports" to Mironovich, and she paid him for doing so.

81. For example, all the shockwave billing allegedly emanating from the Defendant Vine consists of "NYS Form NF-3" bills and verification forms wherein Vine himself – "Vine Mark H MD" – is listed as providing the actual shockwave "treatment."

82. This claim was a complete fabrication.

83. The Defendant Vine became licensed to practice medicine in New York in 1976 – some 47 years ago. Vine is currently employed as the Division Chief of Urology at St. John's Episcopal Hospital in Far Rockaway, New York. He primarily works out of a private medical office under the name "Men's Medical Healthcare" in Nassau County at 123 Maple Avenue, Suite 203, Cedarhurst, New York.

84. The Defendant Vine, late in his career, became involved in this scheme in name only. He does not perform any of the treatment as the Defendants falsely allege in their billing.

85.  The financial circumstances of at least some of the provider Defendants and/or their individual physician owners have enabled the scheme's layperson managers to obtain their assistance.

86.  When the Defendant Vine joined the scheme, he was already in a personal fiscal crisis that made him particularly receptive to participating in the scheme.  In another RICO action pending in this District, GEICO set forth that Vine was the subject of years of federal and state tax delinquencies that totaled over $500,000.00.  These included a personal tax lien that was issued against Vine on April 27, 2018 by the IRS in the amount of $230,887.00.

87.  In addition to the IRS tax lien, Vine had multiple personal tax liens issued by the State of New York in the form of tax warrants for personal income tax delinquency.  From the years 2014 to 2022, warrants had been issued against Vine totaling $397,207.34.

88.  This financial pressure led Vine to conspire with the layperson Defendants who managed the scheme.  Vine essentially sold his license to the fraudulent scheme and the layperson Defendants.

89.  Kenworthy was similarly susceptible to the scheme because of his own debts, including state and municipal tax delinquencies.

90.  The other provider Defendants similarly enabled the layperson Defendants to submit fraudulent billing.  Like Vine, none of the physicians listed on the bills of these other provider Defendants actually provided shockwave services to patients.

91.  The billing submitted on behalf of the provider Defendants used the same generic forms for bills, and the same generic information on those forms, for numerous different patients, without regard to their individual conditions or needs.

C       **The Fraudulent Representations that Shockwave "Treatment"
        was Medically Necessary and Appropriately Performed.**

92.   The bills mailed to Allstate for shockwave services exclusively use CPT billing code 0101T, which is listed in the Fee Schedule as a "temporary code" identifying emerging and experimental technology.   Temporary codes may become permanent codes or deleted during updates of the code set.

93.   The provider Defendants or their owners who are licensed physicians were falsely listed as providing the "treatment."

94.   The shockwave "treatment" allegedly performed on Insureds was fraudulent because the services that were supposedly provided did not qualify for reimbursement under the CPT code.

95.   The use of shockwave for the treatment of back, neck, and shoulder pain is experimental and investigational in nature.

96.   The Defendants did not set forth any specific conditions in their medical reports that the shockwave was needed for.   Only generic claims were made, in many cases with the same exact wording and claims for virtually every single patient.

97.   The Defendants provided shockwave as part of a sham system of referrals in which it was provided to patient after patient in the offices of the complicit referring providers in whose offices the shockwave was provided without regard to the individual conditions of each patient. Shockwave was provided to virtually every patient, without regard to each patient's individual complaints, symptoms, or presentation. The Defendants typically submitted a boilerplate, checklist treatment report containing a stamped signature, not an actual signature.   The shockwave was usually provided to patients soon after the subject motor vehicle accident

24

(MVA), without giving the patients the opportunity to sufficiently respond to more conventional, conservative therapies.

98. For example, in the billing submitted in the name of the Defendant Vine, the Defendants typically rendered shockwave to Insureds less than twenty (20) days after the relevant MVA.

99. In addition, there was a lack of diagnostic clarity about what conditions were specifically being treated in Vine patients.  In the case of a patient with shoulder pain, for example, there are many common causes of shoulder pain. It could be due to bicipital tendonitis, rotator cuff tendonitis, impingement syndrome, fracture, capsular contracture, deltoid strain, shoulder separation, etc. The treatment for each of these conditions is different. Just reporting that a patient has shoulder pain is not a sufficient diagnosis and justification to begin any type of shoulder treatment, including shockwave.

100. Shockwave in musculoskeletal problems has no proven efficacy.  Nonetheless, if a patient does undergo a treatment like shockwave, it is appropriate to wait to see if the treatment is helpful before repeating it.


**D.      Cycling of Provider Defendants with Identical Bills for Shockwave**

101. The layperson Defendants and other managers of the scheme routinely directed that fraudulent shockwave billing be submitted in the names of multiple provider Defendants for the same patient, and at the same Clinic, on different dates of service.

102. For patient after patient, bills were mailed to Allstate making the same misrepresentations as to shockwave services and duplicating the same false diagnostic information and charges.

103. For example, Allstate was billed by or in the name of five different provider Defendants for shockwave treatment services purportedly provided to patient P.T. identified by claim number 0635398802.  Each bill indicates that the services were rendered in a clinic located at 3910 Church Ave., Brooklyn, NY 11203, and each consists only of three charges for shockwave treatments under the same CPT code, and in the same amounts.

104. On or about September 18, 2021, a bill was mailed on behalf of the provider Defendant Kenworthy by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for shockwave treatments purportedly provided by Kenworthy to patient P.T., claim number 0635398802, at the Church Avenue clinic on August 11, 2021.  The bill consists of three separate charges under CPT 0101T for shockwave treatments of the cervical, thoracic, and lumbar spinal regions, each in the amount of $700.39, for a total of $2,101.17.

105. On or about October 29, 2021, a bill was mailed on behalf of the provider Defendant Headlam PC by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for shockwave treatments purportedly provided by Headlam MD to patient P.T., claim number 0635398802, at the Church Avenue clinic on October 1, 2021.  The bill consists of three separate charges under CPT 0101T for shockwave treatments of the right shoulder, left shoulder, and right knee, each in the amount of $700.39, for a total of $2,101.17.

106. On or about November 19, 2021, a bill was mailed on behalf of the provider Defendant Vine by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for shockwave treatments purportedly provided by Vine to patient P.T., claim number 0635398802, at the Church Avenue clinic on October 7, 2021.  The bill consists of three separate charges under CPT 0101T for shockwave treatments of the right shoulder, left shoulder, and right knee, each in the amount of $700.39, for a total of $2,101.17.

107.  Allstate was also billed on behalf of Vine for shockwave treatments purportedly provided to patient P.T., claim number 0635398802, on three additional dates, and in the same amounts.  Specifically, two additional bills were mailed to Allstate on or about November 29, 2021 and December 29, 2021 for shockwave treatments of the cervical, thoracic, and lumbar spinal regions, as provided on October 26, 2021 and December 10, 2021, respectively.  On or about December 30, 2021, Allstate was billed on behalf of Vine for shockwave treatments of the right shoulder, left shoulder, and right knee, as provided on December 7, 2021.

108.  On or about January 31, 2022, a bill was mailed on behalf of the provider Defendant Grace by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for shockwave treatments purportedly provided by Opeoluwa Eleyinafe, MD to patient P.T., claim number 0635398802, at the Church Avenue clinic on January 6, 2022.  The bill consists of three separate charges under CPT 0101T for shockwave treatments of the right shoulder, left shoulder, and right knee, each in the amount of $700.39, for a total of $2,101.17.

109.  On or about March 22, 2022, a bill was mailed on behalf of the provider Defendant Kalitenko MD by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for shockwave treatments purportedly provided by Kalitenko MD to patient P.T., claim number 0635398802, at the Church Avenue clinic on February 11, 2022.  The bill consists of three separate charges under CPT 0101T for shockwave treatments of the cervical, thoracic, and lumbar spinal regions, each in the amount of $700.39, for a total of $2,101.17.

110.  Bills for shockwave treatments submitted in the name of each of these provider Defendants for patient P.T., claim number 0635398802, used preset diagnosis codes and descriptions (Form NF-3, Box 5) depending on which body parts were purportedly being treated.  The sequence, spacing, punctuation, and typeface of the diagnoses are precisely the

same on bills for each of these providers, and apart from one minor variation, the language used is identical.  These diagnosis codes were copied and pasted between bills for different provider Defendants, and/or they were generated using the same software, pursuant to the fraudulent scheme described herein.  The physicians listed on the bills did not draft these reports.  They were generated and submitted by the layperson managers, including Mironovich, NY Billing and the John Doe layperson Defendants.

111.  The bills submitted on behalf of the provider Defendants Kenworthy, Vine, and Kalitenko MD for shockwave treatments of the cervical, thoracic, and lumbar spinal regions, as purportedly provided to patient P.T., claim number 0635398802, all diagnose the patient with "M54.2 Cervicalgia,M54.50 Low back pain…" and "…M54.6 Pain in thoracic spine, " (sic).  The lone variation that appears on these bills is that the second diagnosis for "low back pain" sometimes also adds the word "unspecified," with or without parentheses.

112.  Similarly, the bills submitted on behalf of the provider Defendants Headlam PC, Vine, and Grace for shockwave treatments of the right shoulder, left shoulder, and right knee, as purportedly provided to patient P.T., claim number 0635398802, all use the same diagnosis codes verbatim, with no variation whatsoever.  Each of these bills diagnoses the patient with "M25.511 Pain in right shoulder,M25.512 Pain in left shoulder,M25.561 Pain in right knee, " (sic).

113.  The duplication of preset diagnosis codes and descriptions on bills submitted for the provider Defendants was not limited to one patient or even a few patients.  Again and again, bills for shockwave treatments mailed on behalf of the provider Defendants used the same canned language for patient diagnoses, and the same single diagnostic code, based solely on the body parts for which shockwave was billed.  Each bill also misrepresents on its face that these

diagnosed conditions first arose on the date of the subject motor vehicle accident (MVA), and that they resulted solely from the MVA. It is clear that none of the health providers drafted these diagnosis codes and descriptions.

114. Bills received by Allstate for services purportedly provided to another patient, V.P. identified by claim number 0634566210, exhibit the same patterned diagnoses for shockwave of the spine and joints. For this patient, the billing was submitted on behalf of the provider Defendants Vine and Stybel, for services as provided in a clinic at 4250 White Plains Rd., Bronx, NY 10466.

115. On or about November 26, 2021, a bill was mailed on behalf of the provider Defendant Stybel by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for shockwave treatments purportedly provided by Stybel to patient V.P., claim number 0634566210, at the White Plains Road clinic on January 6, 2022. The bill consists of three separate charges under CPT 0101T for shockwave treatments of the cervical, thoracic, and lumbar spinal regions, each in the amount of $700.39, for a total of $2,101.17. On the face of the bill, the patient is diagnosed with "M54.2 Cervicalgia,M54.5 Low back pain,M54.6 Pain in thoracic spine, " (sic).

116. Allstate then received billing on behalf of the provider Defendant Vine for the same charges and services, as provided to patient V.P., claim number 0634566210, at the White Plains Road clinic on multiple occasions, and each time for precisely the same charges and services. Specifically, billing was received for shockwave treatments by Vine of the cervical, thoracic, and lumbar spinal regions purportedly provided on October 5, October 7, October 21, and October 28, 2021, and the bills were mailed to Allstate on or about November 15, November 18, November 24, and November 26, 2021, respectively. Each of these bills diagnoses the patient

with "M54.2 Cervicalgia,M54.50 Low back pain…" and "…M54.6 Pain in thoracic spine, " (sic), and is, apart from the addition of the word "unspecified" for "low back pain," otherwise identical to the bill for Stybel, and to the bills for spinal shockwave therapy submitted by the five provider Defendants in connection with patient P.T., claim number 0635398802.

117.  Additionally, a bill was mailed on behalf of Vine on or about November 22, 2021 for shockwave treatments of the cervical spine, left shoulder, and left knee purportedly provided to patient V.P., claim number 0634566210, on October 19, 2021, again for charges totaling $2,101.17.  As with prior examples, this bill diagnoses the patient with "M25.512 Pain in left shoulder" and "M54.2 Cervicalgia, " (complete with dangling comma) in support of shockwave treatments of the left shoulder and cervical spine, respectively.  In the same vein, and as has been seen with other patients, this bill diagnosed the patient with "M25.562 Pain in left knee" to support the charge for shockwave of the left knee as well.

118. Another patient, M.R. identified by claim number 0635398802, purportedly received shockwave treatments on multiple dates from the provider Defendants Kenworthy, Headlam PC, Vine, and Grace.  Patient M.R. shares a claim number with and was allegedly injured in the same motor vehicle accident (MVA) as patient P.T..  In fact, patient M.R. and patient P.T. were purportedly treated by the same four (4) provider Defendants on the same seven (7) dates, and at the same Church Avenue clinic.  Even the dates of the bills are the same.  As with shockwave bills for patient P.T. and others, the same vague diagnostic information is copied *verbatim* on the bills mailed to Allstate for each of these several provider Defendants.

119. On or about September 7, 2021, a bill was mailed on behalf of the provider Defendant Kenworthy by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for shockwave treatments purportedly provided by Kenworthy to patient M.R.,

claim number 0635398802, at the Church Avenue clinic on August 9, 2021.  The bill consists of three separate charges under CPT 0101T for shockwave treatments of the lumbar spinal region, right shoulder, and left shoulder, each in the amount of $700.39, for a total of $2,101.17.  On the face of the bill, the patient is diagnosed with "M25.511 Pain in right shoulder,M25.512 Pain in left shoulder,M54.5 Low back pain, " (sic).

120.  On or about October 29, 2021, a bill was mailed on behalf of the provider Defendant Headlam PC by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for shockwave treatments purportedly provided by Headlam MD to patient M.R., claim number 0635398802, at the Church Avenue clinic on October 1, 2021.  The bill consists of three separate charges under CPT 0101T for shockwave treatments of the cervical, thoracic, and lumbar spinal regions, each in the amount of $700.39, for a total of $2,101.17.  On the face of the bill, the patient is diagnosed with "M54.2 Cervicalgia,M54.50 Low back pain,unspecified,M54.6 Pain in thoracic spine, " (sic).

121.  On or about November 19, 2021, a bill was mailed on behalf of the provider Defendant Vine by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for shockwave treatments purportedly provided by Vine to patient M.R., claim number 0635398802, at the Church Avenue clinic on October 7, 2021.  The bill consists of three separate charges under CPT 0101T for shockwave treatments of the cervical and thoracic spinal segments and of the left shoulder, each in the amount of $700.39, for a total of $2,101.17.  On the face of the bill, the patient is diagnosed with "M25.512 Pain in left shoulder,M54.2 Cervicalgia,M54.6 Pain in thoracic spine," (sic).

122.  Allstate was also billed on behalf of Vine for shockwave treatments purportedly provided to patient M.R., claim number 0635398802, on three additional dates, and in the same

amounts.  Specifically, Allstate was billed for: shockwave treatments of the cervical and thoracic spinal regions and of the left shoulder purportedly provided by Vine on October 26, 2021; shockwave of the cervical and thoracic spinal regions and of the right shoulder on December 7, 2021; and shockwave of the cervical, thoracic, and lumbar spinal regions on December 10, 2021.  The bills were mailed on or about their dates of November 29, December 30, and December 29, 2021, respectively.  Each of these bills copies the same canned diagnostic information for each body part or region purportedly treated with shockwave.

123.  On or about January 31, 2022, a bill was mailed on behalf of the provider Defendant Grace by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for shockwave treatments purportedly provided by Opeoluwa Eleyinafe, MD to patient M.R., claim number 0635398802, at the Church Avenue clinic on January 6, 2022.  The bill consists of three separate charges under CPT 0101T for shockwave treatments of the cervical spinal region, right shoulder, and left shoulder, each in the amount of $700.39, for a total of $2,101.17.  On the face of the bill, the patient is diagnosed with "M25.511 Pain in right shoulder,M25.512 Pain in left shoulder,M54.2 Cervicalgia, " (sic).

124.  For patient after patient, shockwave billing was submitted to Allstate in the name of the provider Defendants that duplicated the same diagnostic information, generally referencing "pain" in the body part or region purportedly treated by shockwave.  For example, Allstate has received billing for shockwave services as provided to patient P.A., identified by claim number 0632940960 by the provider Defendants Vine, Grace, and Kalitenko MD on ten dates of service, in a clinic located at 1655 Richmond Ave., Staten Island, NY 10314.

125.  On or about November 22, 2021, a bill was mailed on behalf of the provider Defendant Vine by the layperson Defendants, collection attorneys, and/or others on their behalf

to Allstate for shockwave treatments purportedly provided by Vine to patient P.A., claim number 0632940960, at the Richmond Avenue clinic on October 19, 2022. The bill consists of a single charge under CPT 0101T for shockwave treatment of the left shoulder, in the amount of $700.39. On the face of the bill, the patient is diagnosed with "M25.512 Pain in left shoulder, " (sic). An otherwise identical bill was later mailed to Allstate on or about December 23, 2021 for the same services as purportedly rendered by Vine on December 6, 2021, listing precisely the same vague diagnostic information. These were the first and last bills submitted on behalf of Vine for patient P.A.

126. Allstate was also billed on behalf of Vine for shockwave treatments purportedly provided to patient P.A., claim number 0632940960, on four additional dates, with the left shoulder being treated alongside other body parts of regions. Specifically, Allstate was billed for: shockwave treatments of the cervical and lumbar spinal regions and of the left shoulder purportedly provided by Vine on October 26, 2021; and shockwave of the cervical spinal region and of the left shoulder on November 2, November 9, and November 30, 2021. The bills were mailed on or about their dates of November 25, December 1, December 3, and December 21, 2021, respectively. Each of these bills uses the generic diagnostic descriptions pre-selected by the scheme's managers, including simply referring to the patient's "pain in left shoulder" on the provider Defendants' bills for shockwave therapy of the left shoulder.

127. Three bills have also been submitted on behalf of the provider Defendant Grace for patient P.A., claim number 0632940960, containing the same charge for the same service, and the same singular diagnostic description. Specifically, Allstate was billed for shockwave therapy of the left shoulder as purportedly provided by Eleyinafe on December 13, 2021, December 20, 2021, and January 10, 2022, and the bills were mailed on or about their respective dates of

January 18, January 11, and February 4, 2022.  The diagnostic information on the face of all three bills reads "M25.512 Pain in left shoulder, " (sic).

128.   For the tenth and final date on which patient P.A., claim number 0632940960, purportedly received shockwave therapy of the left shoulder, February 7, 2022, another bill for the same charge and amount was mailed to Allstate on or about its date of March 15, 2022, this time on behalf of the provider Defendant Kalitenko.  Like the nine previous bills submitted on behalf of Vine and Grace for shockwave of the left shoulder as provided to patient P.A., the Kalitenko bill diagnoses the patient with "M25.512 Pain in left shoulder, " (sic).

129.   The same three provider Defendants, Vine, Grace, and Kalitenko – and again in that order – also purportedly provided shockwave treatments to patient S.P., identified by claim number 0644493116, but at another clinical location: 108 Kenilworth Pl., Brooklyn, NY 11210. Here, too, their bills used the same preset codes and language to support billing for the same shockwave services.

130.   On or about December 23, 2021, a bill was mailed on behalf of the provider Defendant Vine by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for shockwave treatments purportedly provided by Vine to patient S.P., identified by claim number 0644493116, at the Kenilworth Place clinic on December 6, 2021.  The bill consists of three separate charges under CPT 0101T for shockwave treatments of the cervical and lumbar spinal regions and of the left shoulder, each in the amount of $700.39, for a total of $2,101.17.  On the face of the bill, the patient is diagnosed with "M25.512 Pain in left shoulder,M54.2 Cervicalgia,M54.5 Low back pain, " (sic).

131.   On or about February 1, 2022, a bill was mailed on behalf of the provider Defendant Grace by the layperson Defendants, collection attorneys, and/or others on their behalf

to Allstate for shockwave treatments purportedly provided by Eleyinafe to patient S.P., identified by claim number 0644493116, at the Kenilworth Place clinic on January 3, 2021. The bill consists of three separate charges under CPT 0101T for shockwave treatments of the cervical and lumbar spinal regions and of the left shoulder, each in the amount of $700.39, for a total of $2,101.17. On the face of the bill, the patient is diagnosed with "M25.512 Pain in left shoulder,M54.2 Cervicalgia,M54.5 Low back pain, " (sic).

132. On or about April 11, 2022, a bill was mailed on behalf of the provider Defendant Kalitenko by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for shockwave treatments purportedly provided by Vine to patient S.P., identified by claim number 0644493116, at the Kenilworth Place clinic on March 2, 2022. The bill consists of three separate charges under CPT 0101T for shockwave treatments of the cervical and lumbar spinal regions and of the left knee, each in the amount of $700.39, for a total of $2,101.17. This bill, submitted using Form 1500, lists only the diagnostic codes as "M542," "M5450," and "M25562" (sic).

III.    **The Defendants' Fraudulent Scheme to Bill for Transcranial Doppler Testing**

133. On top of the fraudulent billing submitted to Allstate for shockwave treatments, five of the provider Defendants – Vine, Poonawala, Kalitenko MD, Grace, and Headlam PC – were used by the scheme's managers to generate further No-Fault billing by purportedly providing their patients with transcranial Doppler ultrasound (TCD) testing.

134. TCD is a non-invasive technique by which specialized equipment is used to target and then measure sound waves to detect and diagnose blood flow problems in the brain. When utilized properly, TCD can aid in the diagnosis of potentially life-threatening conditions.

135. As billed for on behalf of these five provider Defendants, however, the TCD was performed either improperly or not at all, and it was routinely billed for as provided to patients who were not otherwise documented as presenting with any indications of cranial vascular issues.

136. Like the shockwave scheme, TCD was performed, if at all, not by the physicians indicated on their bills, but instead by unqualified non-physicians hired by the scheme's managers. The Defendants Vine, Poonawala, Kalitenko MD, Grace, and Headlam PC did not properly administer such testing, and the test results were routinely fabricated.

137. For each of these provider Defendants, the scheme's managers have designated that their bills use one of two preset combinations of diagnostic codes and descriptions, which have simply been copied and pasted for numerous patients. Bills for Poonawala and Kalitenko MD use one version of the diagnosis, while bills for Vine, Grace, and Headlam PC use a second version.

138. In the first version, as used on the TCD bills of Poonawala and Kalitenko MD, their patients are purportedly diagnosed again and again with the same serious conditions *verbatim*:

> G45.1 Carotid artery syndrome,G45.8 Other transient cerebral ischemic attacks and related syndromes,I63.8 Other cerebral infarction,I63.89 Other cerebral infarction,I65.1 Occlusion and stenosis of basilar artery,I65.29 Occlusion and stenosis of unspecified carotid artery,I66.8 Occlusion and stenosis of other cerebral arteries,

139. In the second version, as used on the TCD bills of Vine, Grace, and Headlam PC, their patients are diagnosed with a very different but nonetheless specific array of conditions, again with identical language for each patient: "G43.001 Migraine without aura, not intractable, with status migrainosus, " (sic).

140.  Regardless of which version was used, bills submitted on behalf of these provider Defendants consisted of the same three charges under the same CPT codes, for the same services, and in the same total amount of $1,641.79.

141.  Moreover, bills for TCD submitted for each of these provider Defendants routinely and falsely represent that the patient, whether they purportedly had migraines or the same multiple serious brain conditions, never previously had the same or similar conditions prior to the subject motor vehicle accident (MVA), and that such conditions were "solely a result of" the MVA.

142.  These kinds of misrepresentations, made on the first page of these Defendants' TCD bills for patient after patient, may be among the most egregious examples of fraud in a No-Fault field already ravaged by it.  Repeatedly, transient cerebral ischemic attacks were diagnosed.  If the patients had actually presented with such conditions, they would have needed treatment, rather than being used as pawns in this fraudulent billing scheme in which such injuries were ignored and not treated.  Yet such treatment was never provided, even though very serious injuries had been diagnosed.

143.  For example, on or about October 14, 2021, a bill was mailed on behalf of the provider Defendant Poonawala by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for TCD testing purportedly provided by Poonawala to patient P.T., claim number 0635398802, at the Church Avenue clinic on October 7, 2021.  The bill consists of three charges for TCD testing under CPT codes 93886, 93890, and 93892-59, in the respective amounts of $507.34, $550.40, and $584.05, for a total of $1,641.79.  On the face of the bill, the patient is diagnosed with:

>     G45.1 Carotid artery syndrome,G45.8 Other transient cerebral ischemic attacks and related syndromes,I63.8 Other cerebral infarction,I63.89 Other

cerebral infarction,I65.1 Occlusion and stenosis of basilar artery,I65.29 Occlusion and stenosis of unspecified carotid artery,I66.8 Occlusion and stenosis of other cerebral arteries,

The bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

144. On or about October 21, 2021, a bill was mailed on behalf of the provider Defendant Poonawala by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for TCD testing purportedly provided by Poonawala to patient M.R., claim number 0635398802, at the Church Avenue clinic on October 12, 2021. The bill consists of three charges for TCD testing under CPT codes 93886, 93890, and 93892-59, in the respective amounts of $507.34, $550.40, and $584.05, for a total of $1,641.79. On the face of the bill, the patient is diagnosed with:

G45.1 Carotid artery syndrome,G45.8 Other transient cerebral ischemic attacks and related syndromes,I63.8 Other cerebral infarction,I63.89 Other cerebral infarction,I65.1 Occlusion and stenosis of basilar artery,I65.29 Occlusion and stenosis of unspecified carotid artery,I66.8 Occlusion and stenosis of other cerebral arteries,

The bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

145. On or about December 10, 2021, a bill was mailed on behalf of the provider Defendant Poonawala by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for TCD testing purportedly provided by Poonawala to patient R.P., claim number 0644421810, in a clinic located at 3041 Avenue U, Brooklyn, NY 11229 on October 14, 2021. The bill consists of three charges for TCD testing under CPT codes 93886, 93890, and

93892-59, in the respective amounts of $507.34, $550.40, and $584.05, for a total of $1,641.79. On the face of the bill, the patient is diagnosed with:

> G45.1 Carotid artery syndrome,G45.8 Other transient cerebral ischemic attacks and related syndromes,I63.8 Other cerebral infarction,I63.89 Other cerebral infarction,I65.1 Occlusion and stenosis of basilar artery,I65.29 Occlusion and stenosis of unspecified carotid artery,I66.8 Occlusion and stenosis of other cerebral arteries,

The bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

146.  On or about March 20, 2022, a bill was mailed on behalf of the provider Defendant Kalitenko MD by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for TCD testing purportedly provided by Kalitenko MD to patient M.W., claim number 0636989915, in a clinic located at 1611 E. New York Ave., Brooklyn, NY 11212 on February 16, 2022.  The bill consists of three charges for TCD testing under CPT codes 93886, 93890, and 93892-59, in the respective amounts of $507.34, $550.40, and $584.05, for a total of $1,641.79. On the face of the bill, the patient is diagnosed with:

> G45.1 Carotid artery syndrome,G45.8 Other transient cerebral ischemic attacks and related syndromes,I63.8 Other cerebral infarction,I63.89 Other cerebral infarction,I65.1 Occlusion and stenosis of basilar artery,I65.29 Occlusion and stenosis of unspecified carotid artery,I66.8 Occlusion and stenosis of other cerebral arteries,

The bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

147.  On or about September 22, 2021, a bill was mailed on behalf of the provider Defendant Headlam PC by the layperson Defendants, collection attorneys, and/or others on their

behalf to Allstate for TCD testing purportedly provided by Headlam MD to patient A.F., claim number 0633718440, in a clinic located at 1735 Pitkin Ave., Brooklyn, NY 11212 on August 10, 2021.  The bill consists of three charges for TCD testing under CPT codes 93886, 93890, and 93892-59, in the respective amounts of $507.34, $550.40, and $584.05, for a total of $1,641.79.  On the face of the bill, the patient is diagnosed with "G43.001 Migraine without aura, not intractable, with status migrainosus, " (sic).  The bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

148. On or about December 17, 2021, a bill was mailed on behalf of the provider Defendant Vine by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for TCD testing purportedly provided by Vine to patient N.G., claim number 0638331116, in a clinic located at 282 Avenue X, Brooklyn, NY 11223 on November 23, 2021.  The bill consists of three charges for TCD testing under CPT codes 93886, 93890, and 93892-59, in the respective amounts of $507.34, $550.40, and $584.05, for a total of $1,641.79.  On the face of the bill, the patient is diagnosed with "G43.001 Migraine without aura, not intractable, with status migrainosus, " (sic).  The bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

149. On or about February 14, 2022, a bill was mailed on behalf of the provider Defendant Grace by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for TCD testing purportedly provided by Eleyinafe MD to patient M.M., claim number 0645516204, in a clinic located at 240-19 Jamaica Ave., Jamaica, NY 11426 on January 12, 2022.  The bill consists of three charges for TCD testing under CPT codes 93886,

93890, and 93892-59, in the respective amounts of $507.34, $550.40, and $584.05, for a total of $1,641.79.  On the face of the bill, the patient is diagnosed with "G43.001 Migraine without aura, not intractable, with status migrainosus, " (sic).  The bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

150.  In support of the fraudulent billing for TCD, phony reports were generated which purported to show each individual patient's testing results, including both numerical data and graphical waveforms.  In some cases, the data and/or waveforms were simply copied and pasted from the TCD report for another patient.

151. For example, Allstate received purported TCD testing reports of the provider Defendant Poonawala as to: patient P.A., claim number 0634430300, for date of service August 9, 2021; and as to patient E.N., claim number 0640636361, for date of service October 13, 2021.  As shown below, the "TCD Exam Data" for these two patients – patient P.A. (left) and patient E.N. (right) – are identical:



152. Due to the complexity of the circulatory system and the many factors that may influence an individual's TCD data and waveforms, it is virtually impossible for two people to have identical reports, with the same numerical values and waveforms.  A person's TCD results are influenced by an array of factors, including: the individual's anatomy, blood vessel structure, blood flow dynamics, medications, and overall health status; the specific conditions being evaluated; or even variations in the ultrasound techniques used during different sessions.

153.  Consistent with their fraudulent nature, these reports contain no indication that the TCD testing ever led to any referral of the patients by these provider Defendants to any relevant specialists.  There is no evidence that these patients were referred for any care based on the purported results of this testing.

154.  The potential severity of some of these diagnoses cannot be overstated.  For instance, a "transient cerebral ischemic attack," one of the diagnoses repeatedly used on the TCD bills submitted for the provider Defendants Poonawala and Kalitenko MD, occurs when a blood clot travels to the brain, with the risk of a subsequent stroke.  To ignore such diagnoses is unimaginable and unconscionable.

155.  If any patients of Vine, Poonawala, and Kalitenko had in fact presented with any issues which TCD might detect – particularly the many patients given the first version of diagnoses listing cardiovascular diseases of the brain – this malfeasance may have gravely endangered their health.  Not only would they have missed a potentially life-saving diagnosis which TCD if done properly may have provided, but to the extent the results were relied upon by other professionals, they also could have adversely impacted patient's care.

## IV.    The Defendants' Fraudulent Scheme to Bill for Vestibular Testing

156.  To inflate the fraudulent billing even further, the same five provider Defendants – Vine, Poonawala, Kalitenko MD, Grace, and Headlam PC – were also used by the scheme's managers to bill for a preselected battery of what are known as vestibular tests.  When performed properly, testing of the vestibular system can aid in diagnosing issues relating to a patient's equilibrium, including dizziness, vertigo, and imbalance.

157.  Like the other services billed for on behalf of these provider Defendants, however, this testing was administered improperly, if at all, to numerous patients with no indication of

medical necessity.  To the extent any such services were rendered, the purported testing was performed by laypersons hired by the scheme's managers, rather than by the provider Defendants or their physician owners as represented on their bills.

158.  One mode of vestibular testing, videonystagmography (VNG), was purportedly provided to patients by each of these five provider Defendants.  VNG is a diagnostic procedure that assesses the vestibular system, with eye movements recorded using infrared cameras, and which provides insights into the inner ear and neural pathways.  The test involves a series of maneuvers and exercises that stimulate the vestibular system, and then a comparison of a patient's eye movement responses to norms, aiding diagnoses.

159.  None of the VNG or other vestibular testing was performed by the physicians as listed on the bills submitted for these five provider Defendants.  Nor was the VNG testing performed by any qualified professional, including any audiologist, otolaryngologist, or physician specializing in hearing, balance disorders, or ear, nose, and throat disorders.  These provider Defendants did not administer any such test, the test was performed improperly if it was even performed, and the test results were fabricated.

160.  As with TCD testing, the scheme's managers have designated that the bills of these five provider Defendants use one of two preset combinations of diagnostic codes and descriptions, which have simply been copied and pasted for numerous patients.  Bills for Poonawala and Kalitenko MD again use one version of the diagnostic information, while bills for Vine, Grace, and Headlam PC again use a second version.  These bills also routinely and falsely represent that the patient never previously had the same or similar conditions prior to the subject motor vehicle accident (MVA), and that such conditions were "solely a result of" the MVA.

44

161. These Defendants' bills for vestibular testing also use one of two preselected combinations of CPT billing codes and amounts.  Bills for Poonawala and Kalitenko MD consist of the same total charges under six CPT codes, while bills for Vine, Grace, and Headlam PC consist of the same total under four CPT codes.

162. Bills for these five provider Defendants relate to vestibular testing on the same dates of service on which the same Defendant purportedly rendered TCD testing for the same patient.  These two types of charges – for TCD testing and vestibular testing – never appear on the same bill and are always billed separately, even though these pairs of bills are generally dated and submitted to Allstate on the same dates as well.  Thus not only were numerous patients diagnosed with serious brain injury diagnoses; they were diagnosed with the same vestibular disorders as well.  These diagnoses were fictitious.

163. For example, on or about October 14, 2021, a bill was mailed on behalf of the provider Defendant Poonawala by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for vestibular testing purportedly provided by Poonawala to patient P.T., claim number 0635398802, at the Church Avenue clinic on October 7, 2021.  The bill consists of six charges for vestibular testing under CPT codes 92537, 92540, 92546-59, 92546-59-76, 92547, and 92548, in the respective amounts of $87.12, $140.37, $91.77, $91.77, $56.12, and $187.19, for a total of $654.34.  On the face of the bill, the patient is diagnosed with:

> H81.399 Other peripheral vertigo, unspecified ear,H81.09 Meniere's disease, unspecified,H81.13 Benign paroxysmal vertigo, bilateral,H81.49 Vertigo of central origin,R26.9 Awkward uncoordinated of walking,R27.0 Loss of coordination of voluntary muscular movement,R42 Dizziness,Z91.81 History of falling,

Like Poonawala's bill for TCD testing as to the same patient and the same date of service, this bill represented that these conditions first arose on the date of the subject MVA, that the patient

never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

164. On or about October 21, 2021, a bill was mailed on behalf of the provider Defendant Poonawala by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for vestibular testing purportedly provided by Poonawala to patient M.R., claim number 0635398802, at the Church Avenue clinic on October 12, 2021.  The bill consists of six charges for vestibular testing under CPT codes 92537, 92540, 92546-59, 92546-59-76, 92547, and 92548, in the respective amounts of $87.12, $140.37, $91.77, $91.77, $56.12, and $187.19, for a total of $654.34.  On the face of the bill, the patient is diagnosed with:

> H81.399 Other peripheral vertigo, unspecified ear,H81.09 Meniere's disease, unspecified,H81.13 Benign paroxysmal vertigo, bilateral,H81.49 Vertigo of central origin,R26.9 Awkward uncoordinated of walking,R27.0 Loss of coordination of voluntary muscular movement,R42 Dizziness,Z91.81 History of falling,

Like Poonawala's bill for TCD testing as to the same patient and the same date of service, this bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

165.  On or about March 20, 2022, a bill was mailed on behalf of the provider Defendant Kalitenko MD by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for vestibular testing purportedly provided by Kalitenko MD to patient M.W., claim number 0636989915, in a clinic located at 1611 E. New York Ave., Brooklyn, NY 11212 on February 16, 2022.  The bill consists of six charges for vestibular testing under CPT codes 92537, 92540, 92546-59, 92546-59-76, 92547, and 92548, in the respective amounts of $87.12,

$140.37, $91.77, $91.77, $56.12, and $187.19, for a total of $654.34.  On the face of the bill, the patient is diagnosed with:

> H81.399 Other peripheral vertigo, unspecified ear,H81.09 Meniere's disease, unspecified,H81.13 Benign paroxysmal vertigo, bilateral,H81.49 Vertigo of central origin,R26.9 Awkward uncoordinated of walking,R27.0 Loss of coordination of voluntary muscular movement,R42 Dizziness,Z91.81 History of falling,

Like Kalitenko MD's bill for TCD testing as to the same patient and the same date of service, this bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

166. On or about December 17, 2022, a bill was mailed on behalf of the provider Defendant Vine by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for vestibular testing purportedly provided by Vine to patient N.G., claim number 0638331116, in a clinic located at 282 Avenue X, Brooklyn, NY 11223 on November 23, 2021. The bill consists of four charges for vestibular testing under CPT codes 92533, 92540, 92546, 92548, in the respective amounts of $80.48, $140.37, $91.77, and $187.19, for a total of $499.81.  On the face of the bill, the patient is diagnosed with "R42 Dizziness and giddiness, " (sic).  Like Vine's bill for TCD testing as to the same patient and the same date of service, this bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

167. On or about the same date as the preceding example, December 17, 2021, a bill was mailed on behalf of the provider Defendant Vine by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for vestibular testing purportedly provided by

Vine to patient S.L., claim number 0643629355, in the same Avenue X clinic on the same date of service, November 23, 2021.  The bill consists of four charges for vestibular testing under CPT codes 92533, 92540, 92546, 92548, in the respective amounts of $80.48, $140.37, $91.77, and $187.19, for a total of $499.81.  On the face of the bill, the patient is diagnosed with "R42 Dizziness and giddiness, " (sic)  Like Vine's bill for TCD testing as to the same patient and the same date of service, this bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

168. On or about February 14, 2022, a bill was mailed on behalf of the provider Defendant Grace by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for vestibular testing purportedly provided by Eleyinafe to patient M.M., claim number 0645516204, in a clinic located at 240-19 Jamaica Ave., Jamaica, NY 11426 on January 12, 2022.  The bill consists of four charges for vestibular testing under CPT codes 92533, 92540, 92546, 92548, in the respective amounts of $80.48, $140.37, $91.77, and $187.19, for a total of $499.81.  On the face of the bill, the patient is diagnosed with "R42 Dizziness and giddiness, " (sic)  Like Grace's bill for TCD testing as to the same patient and the same date of service, this bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

169. On or about September 22, 2021, a bill was mailed on behalf of the provider Defendant Headlam PC by the layperson Defendants, collection attorneys, and/or others on their behalf to Allstate for vestibular testing purportedly provided by Headlam MD to patient A.F., claim number 0633718440, in a clinic located at 1735 Pitkin Ave., Brooklyn, NY 11212 on

August 10, 2021.  The bill consists of four charges for vestibular testing under CPT codes 92533, 92540, 92546, 92548, in the respective amounts of $80.48, $140.37, $91.77, and $187.19, for a total of $499.81.  On the face of the bill, the patient is diagnosed with "R42 Dizziness and giddiness, " (sic).  Like Headlam PC's bill for TCD testing as to the same patient and the same date of service, this bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

170.  As with TCD testing, the scheme's managers and their personnel generated and submitted phony reports for vestibular testing in support of billing on behalf of these provider Defendants.  The results of vestibular testing including VNG are, much like TCD testing, influenced by a multiplicity of patient-specific and situational factors, and they may also be depicted using complex data as well as graphical waveforms.

171.  It is medically implausible that two different patients' results for vestibular testing including VNG would consist of identical numerical data and/or waveforms.  Nonetheless, in some instances, reports submitted in support of billing by these provider Defendants simply copied and pasted data and/or waveforms from a report that the scheme had previously used for another patient.

## V.    The Provider Defendants' Interchangeable Use in the Scheme

172.  The provider Defendants have been not merely interrelated, and not merely commonly controlled, but also wholly interchangeable.  In an effort by the scheme's managers to avoid or delay detection, billing was shifted from one provider Defendant to another.  These Defendants and/or their physician owners did not provide the services as billed in their names, and they were used as fronts for the submission of fraudulent billing by the laypersons who

managed the scheme, including the Defendants Mironovich, NY Billing, John Does 1-6, and ABC Corps. 1-6.

173.  By distributing the billing among several providers, the amount attributable to any one provider Defendant was reduced.  In this way, the scheme's managers aimed to obscure the nature and scale of the fraud, as well as the identities of its participants.  This aspect of the scheme also allowed them to easily discontinue the use of any provider that is subjected to scrutiny, and simply replace it with another.

174.  As discussed and demonstrated through examples in the factual allegations above, numerous fraudulent bills were mailed to Allstate on behalf of the provider Defendants for shockwave therapy, TCD testing, and vestibular testing.  Billing was submitted on behalf of all the provider Defendants for shockwave, and on behalf of five – Vine, Poonawala, Kalitenko MD, Grace, and Headlam PC – for TCD testing and vestibular testing.

175.  In many cases, several of the provider Defendants purportedly rendered all three types of services for the same patient, often with shockwave as provided on multiple dates of services by more than one provider Defendant.

176.  These providers' bills used common forms and filled them using preselected information, with rote diagnoses and charges having no medical necessity, and no relationship to the particular patient or their history.  In some instances, even the patients'

177.  As a further measure to hinder detection of the scheme, its layperson managers always generated and submitted separate bills for TCD testing and vestibular testing, even though these testing services were purportedly performed by the same provider Defendant for the same patient, on the same date.  For patient after patient, the bills of these provider Defendants listed the same phony – and sometimes potentially life-threatening – diagnoses of the patients'

relevant conditions.  It is absurd for numerous patients to have word for word the same brain injury diagnoses.  It is also absurd for numerous patients to have word for word the same vestibular disorders.  And it is beyond absurd for patient after patient after patient to have both sets of symptoms with word for word identical language.

178.  Each provider Defendant's bills always used a preselected version of the diagnoses set forth on page 1 of the bill, and this is duplicated for every patient.  On each of their bills for TCD testing and vestibular testing, Kalitenko MD's and Poonawala's patients are given the same diagnoses word for word, including, in the case of TCD, cerebrovascular conditions which may entail the risk of stroke.  On bills for vestibular testing, numerous patients of Kalitenko MD and Poonawala are diagnosed with the same specific inner ear and related conditions, including Meniere's disease.

179.  Likewise, bills for the provider Defendants Vine, Grace, and Headlam PC list the same diagnostic information for each of their patients on their respective (and always separate) twinned bills for TCD and vestibular testing.  Patients of Vine, Grace, and Headlam PC are always diagnosed on bills for TCD testing as having the same migraine and related conditions. On bills for vestibular testing, these patients are diagnosed simply with "[d]izziness and giddiness."

## VI.   The Defendants' Awareness of the Illegality of Their Conduct

180.  Six of the health provider Defendants, as well as Mironovich and NY Billing, have been sued in similar actions by GEICO.  These actions and the evidence adduced therein have made it plain to the Defendants that they were involved in a very serious fraudulent scheme. After being sued in these actions, each of these Defendants was well-aware of the fraudulent scheme, and of the use of their names and licenses in the scheme.

181.  These actions have placed the Defendants on notice of the illegality of their fraudulent conduct.  Mironovich, Kalitenko, and Stybel have all invoked the Fifth Amendment in response to discovery requests in the GEICO actions.

182.  Despite being aware of the fraudulent scheme and their role in it, efforts to collect the billing in the name of the Defendant health providers have continued against Allstate.  The health provider Defendants have enabled this fraudulent billing and have failed to provide any warning, notice, or assistance to Allstate regarding the fraudulent billing for fictitious services in their names.

183.  It cannot be doubted that these Defendants have at all relevant times been aware of the import and potential consequences of their treatment and billing practices.  Indeed, each of these prior civil actions has been based on one or more patterns of fraudulent or otherwise illegal conduct which are similar if not identical to those alleged herein.

184.  These actions include the following:

*GEICO v. Vine, et al.*

185.  In the *Vine* action, filed in this District on May 19, 2022, GEICO named Vine, Mironovich, and NY Billing as defendants.  *See* No. 22-CV-2965 (EK) (LB) (E.D.N.Y. May 19, 2022).  The complaint alleged the fraudulent provision of and billing for the same three types of services:  shockwave therapy, TCD testing, and vestibular testing including videonystagmography (VNG).  GEICO further claimed that unlicensed individuals not under Vine's control administered these services. Vine has practiced as a urologist and was not involved in the provision of these services for musculoskeletal injuries.  Vine's name and license were controlled by Mironovich and NY Billing, who used it to generate and submit fraudulent

billing, and who paid illegal kickbacks to third parties to obtain referrals of patients. The complaint also alleged that Vine was a prospect for the fraudulent scheme due to his financial difficulties and tax issues.

186. By stipulation dated June 21, 2022, Vine agreed to enjoin collection proceedings against GEICO. NY Billing defaulted in the action as of June 30, 2022.

187. Earlier this year, Geico presented evidence in *Vine* indicating that Mironovich and NY Billing were responsible for various aspects of the illicit operation, including hiring and scheduling the laypersons who administered the tests, obtaining assignments of benefits and referrals of patients, and communicating with at least one firm providing funding. Mironovich chose to plead the protections of the Fifth Amendment in response to all interrogatories and document requests propounded by GEICO in *Vine*.

### *GEICO v. Kenworthy, et al.*

188. In *Kenworthy*, GEICO sued the Defendants Kenworthy, Mironovich, and NY Billing. *See* No. 22-CV-3728 (LDH) (SJB) (E.D.N.Y. June 23, 2022). The complaint alleged fraudulent billing for shockwave, and that unlicensed laypersons provided the services and falsified reports.

189. GEICO alleged further that Kenworthy did not provide the services billed in his name and did not control the practice that performed the services. Instead, the practice was controlled by NY Billing, which billed using Kenworthy's name and license, and which paid illegal kickbacks to referring providers' clinics to obtain patient referrals. GEICO added that Kenworthy was a prospect for the fraudulent scheme because of his debts including state and city tax delinquencies.

190. By stipulation dated August 16, 2022, Kenworthy agreed to stay and enjoin underlying collection proceedings against GEICO.  As of July 29, 2022, NY Billing was noted to be in default by the Clerk.  The case was settled without prejudice as to the remaining defendants Kenworthy and Mironovich.

*GEICO v. Kalitenko, et al.*

191. In the *Kalitenko* complaint, GEICO named as defendants both Kalitenko MD and Kalitenko PC, alleging the fraudulent provision of and billing for all three types of fraudulent services at issue herein: shockwave therapy, TCD testing, and vestibular testing.  *See* No. 22-CV-3804 (ARR) (SJB) (E.D.N.Y. June 28, 2022).  GEICO again alleged that unlicensed laypersons, not Kalitenko MD, administered these services.  Kalitenko MD was not involved in the provision of these services and was in Florida for a portion of the time when these services were performed.  Kalitenko MD had no control over his professional corporation, with other laypersons using his name, medical license, and tax ID for billing.

192. The *Kalitenko* complaint also alleged that some of the fraudulent services occurred in clinics linked to a previous indictment and federal prosecution in *USA v Rose, et al*.  *See* No. 19-CR-0789 (PGG) (S.D.N.Y. Nov. 6, 2019).  According to GEICO, patient referrals were exchanged for illegal kickbacks and payoffs.  Regarding the administration of the vestibular tests including VNG, appropriate preparation protocols were not followed which required abstaining from medication, stimulants (like caffeine and alcohol), and food.

193. Additionally, GEICO set forth that Kalitenko MD has publicly rejected "Western medicine" in favor of holistic approaches, and that he has admitted to having no

experience in physiatry or rehabilitative medicine: the areas of medicine involved with the fraudulent services in the case.

194. Both Kalitenko MD and Kalitenko PC sought to invoke the Fifth Amendment privilege in response to GEICO's discovery requests.  In June of this year, a settlement was reached, and the case was dismissed without prejudice as to both defendants.

### *GEICO v. Poonawala, et al.*

195. In *Poonawala*, GEICO again filed a complaint alleging fraudulent billing for the same three types of services – shockwave therapy, TCD testing, and vestibular testing including VNG – against the Defendant Poonawala, among others.  See No. 22-CV-3063 (PKC) (VMS) (E.D.N.Y. May 24, 2022), *as amended* (May 10, 2023).  As in the other actions, GEICO alleged that unlicensed laypersons, not Poonawala, administered the services, that Poonawala did not own self-named practice appearing on bills, and that he had no control of the practice, with laypersons using his name, medical license, and tax ID to bill for the fraudulent services.

196. As in the *Kalitenko* suit, GEICO alleged in *Poonawala* that some of the fraudulent services occurred in clinics already implicated in the *Rose* indictment and criminal case.  *See* No. 19-CR-0789 (PGG) (S.D.N.Y. Nov. 6, 2019).  Patient referrals were exchanged for illegal kickbacks and payoffs.

197. With its amended complaint in May of this year, GEICO added the defendants Gary Lance Grody, Irina Zayonts, Yuriy Zayonts, and Alex Puzaitzer, claiming that they were the true owners and controllers of the Poonawala practice.  According to GEICO, Grody had recruited Poonawala for the fraudulent scheme.

198.  GEICO stated further that Grody, a convicted felon, had previously been ordered to pay $280,000 to Allstate due to his involvement in another scheme.  Two of the other defendants, Irina and Yuriy Zayont, were indicted and pleaded guilty in connection with a separate scheme aimed at defrauding the No-Fault system.  Additionally, Alex Puzaitzer was indicted for his role in a securities fraud scheme, pleaded guilty, and served a prison sentence.

### *GEICO v. Stybel, et al.*

199.  The complaint in *Stybel* initially named as defendants only Stybel and her putative self-named sole proprietorship, but GEICO would later amend the complaint to add Mironovich and NY Billing, among others.  *See* No. 22-CV-2834 (PKC) (MMH) (E.D.N.Y. May 16, 2022), *as amended* (Feb. 9, 2023).  In *Stybel*, GEICO alleged a scheme for the fraudulent provision of and billing for shockwave services by or on behalf of her proprietorship, which conducted business in Brooklyn.  An osteopath by training and license, Stybel works at the Amityville Family Practice, located in Amityville, Suffolk County, NY.  Her proprietorship, however, was not under the control of Stybel but instead was operated, managed, and controlled by laypersons including Mironovich and others.  Stybel allowed these laypersons to use her proprietorship's name, medical license, and tax ID for fraudulent No-Fault billing.

200.  According to GEICO, Stybel did not perform the fraudulent services billed for by her proprietorship.  Mironovich and NY Billing obtained unlicensed individuals who administered the services without Stybel's supervision.  These unlicensed individuals were not employed by Stybel or her proprietorship.  Deposition testimony given in *Stybel* set forth that Mironovich was the one who directed these unlicensed technicians, who falsified reports to fabricate justifications for the services.  Mironovich and NY Billing, along with others, set up

kickback agreements with referring providers' clinics to secure a consistent flow of patients and revenue.  Additionally, Mironovich and NY Billing were responsible for providing billing documents to collection attorneys as part of their operation.

201.  By joint motion of the parties, as of July 26, 2022, Stybel agreed to a stay of collection proceedings against GEICO.  On February 9, 2023, GEICO filed the amended complaint, expanding the list of defendants to include Mironovich, NY Billing, and additional associates.  As of April 5, 2023, the Clerk formally noted that NY Billing had defaulted in *Stybel*, just as it had done in both *Vine* and *Kenworthy*.

202.  In *Stybel*, GEICO sought a default judgment against NY Billing and other defendants that did not respond to the amended complaint, including Evergreen & Remegone LLC ("Evergreen").  GEICO submitted an affidavit and a deposition transcript from layperson "technicians" demonstrating that there was no involvement by physicians in the services. Evergreen, owned by Stybel, made payments to laypersons who provided the services, and to the referring providers at the clinics where the scheme operated. Notably, Evergreen was established shortly before the *Stybel* scheme began, and Evergreen's bank account was opened at the scheme's outset to facilitate payments to Stybel: payments which were used to pay the layperson "technicians" and referring health providers.

203.  One of these layperson "technicians" testified that his training to administer shockwave consisted of attending a 30–40-minute online lecture and answering questions.  With this training, he then proceeded to train other laypersons to administer shockwave.

204.  Exhibit 17 includes the deposition transcript of Paresh Vedawala, for the Vine, Stybel, and Kalitenko cases. A subpoena was issued to Kush Gold d/b/a Ruche Gems, where Vedawala serves as the president. He primarily operates in the jewelry business, with Kush

specializing in 24-carat gold bullion. He received orders from two companies that proceeded to convert over $11 million into untraceable gold bullion.  These companies had received the funds as part of the scheme at the direction of Mironovich.

205.  Mironovich and NY Billing were yet again central figures in the fraudulent scheme alleged herein.  They controlled the billing and practices in the names of the Defendants Vine, Stybel and Kenworthy, and they appear to have interfaced or coordinated with the billing activities of the other Defendants for the same patients.

206.  Mironovich and NY Billing formed kickback relationships with the clinics that made referrals to the Defendants Vine, Stybel, and Kenworthy.

207.  The Defendants Mironovich and NY Billing provided laypersons to perform the fraudulent services alleged in the instant Complaint.  The Defendants Mironovich and NY Billing put together a schedule for which clinical offices the laypersons would travel to each month, and they directed the laypersons who provided the fraudulent services to do so at the offices as scheduled.

208.  In *Stybel*, GEICO took the depositions of two individuals who recruited laypersons for Mironovich and the scheme.

209.  An individual named Artem Smirnov testified that as an owner of a company called Trydat, Inc., he used to work for Mironovich.  He provided Mironovich and the scheme with the individuals, including laypersons, who administered shockwave services in the clinics to which they were sent by Mironovich.  It was Mironovich who provided him with the schedule where his employees should go to administer shockwave services.

210.  Smirnov testified that he was provided with paperwork including forms in the name of Stybel by Mironovich.  Smirnov never met Stybel, and he did not know the names of the medical practices or practitioners at the clinical offices where he was sent for this work.

211.  Smirnov brought Mironovich "stacks" of phony reports for shockwave services, and she paid him for the reports by handing him checks from non-party Evergreen.

212.  Evergreen was formed in December of 2020 and is or was owned on paper by Stybel.  Its bank account was opened at the beginning of the scheme in 2001 by Stybel.  It was used to pay the laypersons who provided the fraudulent services, and to pay health care providers for referrals of patients into the scheme.

213.  Another individual named Dennis Balter testified that he has owned one entity called FCTE Tech Service and has also worked for another named Romgo Tech Services.  Balter is Romgo's manager, and Romgo is owned by his wife.  His job at Romgo was to find individuals to administer shockwave treatment.  Balter had himself only learned how to provide shockwave to patients by viewing an online lecture of 30-40 minutes.  Based on this "training," Balter then showed the other laypeople he hired how to administer the fraudulent shockwave services.

214.  Like Smirnov, Balter testified that he has never met the Defendant Stybel, has never talked to her, and has never been in the same room as her.   He had only seen her name on paperwork.

215.  Balter likewise testified that Mironovich gave him a schedule of where the laypeople he hired should go to administer the fraudulent shockwave services.  At the clinical offices, the front desk personnel would bring the patients to him.  He and his employees would administer the shockwave and prepare the forms with the results.

216. Again like Smirnov, Mironovich paid Balter by handing him checks from Evergreen as payment for the fraudulent shockwave services he provided.

217. Balter had no idea for which medical practice he and his employees were working, and he never tried to find out this information.

218. Mironovich gave him the forms with preselected and prefilled information, including the body parts or areas of the patient's supposed complaints, and even the results as listed on the reports for individual patients.

219. The shockwave treatment took five to seven minutes in total to perform.

220. Evidence in *Stybel* demonstrated further that Mironovich submitted the billing to collection attorneys. When funds were received from insurers, she directed payment to money laundering entities known as "Blue Tech" and "Sunstone." Blue Tech and Sunstone in turn converted the No-Fault proceeds yielded in collections into untraceable gold bullion. GEICO obtained checks from their accounts, and took the deposition of a jeweler who sold gold bullion to Blue Tech and Sunstone. In this way, over $11 million was converted into gold bullion.

221. Stybel took a significant part in the overall scheme. In addition to ceding her medical license and practice to Mironovich, she formed Evergreen, which was used to pay off the layperson "technicians" and their recruiters and managers, including Smirnov and Balter.

222. Mironovich invoked the Fifth Amendment once more in *Stybel*, refusing to answer all document requests and interrogatories. Stybel also pleaded the Fifth Amendment in response to GEICO's requests for discovery.

## VII.   The Defendant Kalitenko MD's Failure to Verify Claims

223. Bills were submitted on behalf of the Defendant Kalitenko MD, and Allstate has sought to verify these claims and to ascertain the basis(es) or lack thereof for such billing.

Allstate has made numerous written verification requests which have been ignored.  Allstate has also requested the examination under oath (EUOs) of Kalitenko MD, who has failed to appear for such EUO, and who has thereby violated a policy condition.

## VIII.   The Defendants' Fraudulent Scheme to Bill in Violation of the Fee Schedule

224.  The Defendants have submitted excessive billing that depleted the patients' insurance coverage and contributed to the cost of No Fault insurance for consumers.

225.  In this pattern of inflated and unnecessary services, the Defendants regularly submitted inflated and unnecessary billing to Allstate.  The services were not provided by the Defendant health providers and to the extent they were provided at all, they were provided by persons who are not physicians or otherwise qualified to do so, and who are not entitled to be compensated for providing medical services.

226.  While as previously discussed, the Defendants did not provide the services as set forth in the Fee Schedule, even if they had administered shockwave, those services would have a limit of one charge per day.  The Defendants constantly violated this limitation.

## IX.   The Defendants' Fraudulent Scheme to Bill for
## Services Rendered by Independent Contractors

227.  Under the No-Fault Law, a health care provider is not entitled to payment from insurers for services provided by independent contractors.  The applicable DFS Regulations provide, in pertinent part, for "pay[ment of] benefits directly to providers of health care services."  11 NYCRR 65-3.11(a) (emphasis added).  In the leading decision on this question, the Appellate Division, Second Department held that "11 NYCRR 65-3.11(a)does not authorize direct payment to a medical provider which submits a bill identifying the treating provider as an

61

independent contractor." *A.M. Med. Servs. v. Progressive Cas. Ins. Co*., 101 A.D.3d 53, 62 (2nd Dep't 2012).

228.  The DFS and its predecessor the Insurance Department have issued a series of opinion letters setting forth their position that professional corporations (PCs) cannot submit bills in their own name for services provided by independent contractors, and those opinions are entitled to deference by the courts unless irrational or unreasonable.  *See Marin v. Apple-Metro, Inc.*, No. 12-cv-5274 (ENV) (CLP), 2020 U.S. Dist. LEXIS 195258, at *34-35 (E.D.N.Y. Oct. 7, 2020) ("Deference extends even to informal opinion letters that 'represent[] the position' of the relevant agency.") (quoting *A.M. Medical*, 101 A.D.3d at 64).

229.  The decision of the Appellate Division in *A.M. Medical* was rendered in deference to a February 21, 2001 informal opinion letter of the General Counsel of the Insurance Department.  In that letter, the General Counsel stated that "[w]here the health services are performed by a provider who is an independent contractor with [a (PC)] and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services."  *A.M Medical*, 101 A.D.3d at 63.  The Appellate Division quoted at length from the February 21, 2001 opinion letter:

> Such direct billing by the PC, due to the lack of supervisory control by the PC, may facilitate fraud, since the PC might bill under its own fee schedule as a specialist rather than the general practitioner fee schedule of the independent contractor, who actually provided the service. In addition, the patient may wrongfully believe the independent contractor's actions are under the supervision of the PC.

> Since New York Education Law § 6509-aspecifically authorizes shareholders and employees to contribute to the income of a PC, and is separate with respect to independent contractors, allowing the PC to bill for the independent contractor may constitute unlawful fee splitting....

> Accordingly, since the control, and therefore the liability, of the principal for the acts of the independent contractor is attenuated, and in order to preserve the integrity of the No-Fault and physician licensing systems, this Department has

> determined that, when the services are provided by an independent contractor, the PC should not be considered as the 'licensed provider' authorized to bill under No-Fault."

*Id.* (quoting Ops. Gen. Counsel NY Ins. Dep't No. 01-02-13 (Feb. 21, 2001)).

230.  The Insurance Department (now the DFS) upheld and reaffirmed the 2001 opinion regarding billing for services performed by independent contractors in subsequent opinion letters, including without limitation letters dated February 5, 2002; March 11, 2002; October 29, 2003; and March 21, 2005.

231.  In order to permit insurers to know whether services have been provided by employees or independent contractors, DFS promulgated a prescribed claim form – Form NF-3 – that requires a health care provider to disclose whether the billed-for services were provided by employees or independent contractors.  The Defendants have repeatedly set forth false information as to who provided the services, claiming that it was the Defendant health providers or their owners who are licensed physicians, when in actuality it was performed by laypersons or by no one at all.  These laypersons were not employees of the billing provider Defendants but were independent contractors to the extent they provided any services.  As set forth in the deposition testimony taken by GEICO of the laypersons who administered these services, the laypersons did not even know for which medical practice they were supposedly working.

232.  To the extent that any services were provided at all, the services were provided by independent contractors, and the provider Defendants or their nominal owners who are physicians were not involved in the providing of services.

X.    **The Defendants' Fraudulent Scheme was Enabled by Illegal Referrals of Patients**

233.  The referral network and the payments to referring providers were the foundation of this scheme.  The Defendants obtained the patients with payments to the referring providers.   In particular, the Defendants Mironovich, NY Billing, and Stybel were key parties in orchestrating the scheme.

234. Under Section 238-d of the New York Public Health Law, referrals between financially related providers are generally prohibited, except where that financial relationship is disclosed to the patient.  Courts have interpreted this statute as prescribing a non-precludable defense for insurers against No-Fault claims.  *See Fair Price Med. Supp. Corp. v. ELRAC Inc.*, 12 Misc. 3d 119, 121-22, 820 N.Y.S.2d 679, 681 (App. Term 2nd Dep't 2006).

235. Moreover, for certain enumerated health care services, even disclosure of a relationship to patients will not cure a self-referral violation.  Section 238-a(1) of the Public Health Law forbids a provider from referring patients to another provider with which it has a financial relationship for clinical laboratory services, pharmacy services, radiation therapy services, physical therapy (PT) services, and x-ray or imaging services.  Any billing for services resulting from such a referral is also prohibited by Section 238-a(2).  Such referrals and billing are illegal even with disclosure to the patient of a financial relationship between the providers.


A.    **Illegal Referrals to the Defendants (P.H.L. § 238-d)**

236. The Defendants obtained their patients from referring providers that they had financial relationships with and did not disclose that financial relationship to patients, in violation of Section 238-d of the Public Health Law.

237.  The referral of patients between these financially related entities was illegal under New York law.  The true nature and extent of the interrelationships were not disclosed to patients.

238.  In addition, the health care provider Defendants have been used interchangeably as part of a pattern of sharing the patients between financially related entities.  This is also illegal and was part of an illegal pattern of referrals.

**B.      Illegal Referrals for Doppler Testing (P.H.L. § 238-a)**

239.  Doppler ultrasound testing, including TCD, is an enumerated service pursuant to P.H.L. § 238-a.

240.  The referring providers are prohibited from making referrals to the health provider Defendants for Doppler testing under P.H.L. § 238-a(1), and the Defendants Poonawala, Grace, Headlam PC, Kalitenko MD, and Vine are prohibited from billing Allstate for doppler testing based on such referrals under P.H.L. § 238-a(1) and Allstate has the right to recover all amounts paid under P.H.L. § 238-a(1).

**FIRST CLAIM FOR RELIEF**

**(Common Law Fraud)**

**(Against All Defendants)**

241.  Allstate repeats and realleges the allegations set forth in paragraphs 1 through 240 of this Complaint with the same force and effect as if set forth fully herein.

242. As part of the fraudulent scheme implemented by the Defendants, as set forth in detail in this Complaint, the Defendants made material misrepresentations and/or omitted material statements in submitting No-Fault claims to Allstate for payment.

243. As set forth herein, the Defendants intentionally, knowingly, fraudulently, and with an intent to deceive Allstate and the public, omitted material facts and made various misleading statements (i) intending to hold out the Defendants as legal and lawfully operating professional entities licensed in the state where the services were provided when in fact they were not; (ii) intending to fraudulently induce Allstate to make payments that the Defendants were not entitled to because of their illegal operation or because of the existence of an illegal referral arrangement and/or because the services were not provided as billed and/or because the findings and reports of the Defendants were fictitious; (iii) intending to fraudulently induce Allstate to make payments by representing that the services had been provided by properly licensed doctors; (iv) misrepresenting the nature of the services that had been administered and misrepresenting the relationship of the services to a covered accident; (v) misrepresenting that the referrals and services were necessary; (vi) misrepresenting that the services were provided by employees; (vii) misrepresenting the applicable fees for the services that were allegedly provided; (viii) misrepresenting that Defendants were being legally owned and lawfully operating as required by licensing requirements; and (ix) setting forth fictitious diagnoses and representations of services provided.

244. As set forth herein, the Defendants intentionally, knowingly, fraudulently, and with an intent to deceive Allstate, their own patients and the general public, hid improper referral relationships and did not provide the services that were billed by making false representations of material facts, including, but not limited to, the following fraudulent misrepresentations: (i) false and misleading statements that services had been provided and were provided by employees when the services were fictitious and were not provided as billed and were not provided by employees; (ii) false and misleading statements contained in each separate bill, medical record

and report submitted to Allstate regarding the nature of service provided and/or the relationship between the Defendants, the shareholder-doctors, and entities to which referrals were made;(iii) false and misleading statements as to the details of the Defendants' operation, management, ownership and lack of compliance with State licensing requirements which not only defrauded Allstate but also endangered the welfare of the public; and (iv) false and misleading statements as to the details of the services administered to patients and the applicable fees.

245. The Individual Defendants, acting in concert with the Entity Defendants, participated in, conspired together, aided and abetted, and furthered the fraudulent schemes through a common course of conduct and purpose.

246. The Defendants concealed the fraudulent nature of their claims through their misrepresentations and material omissions. In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud. The Defendants' fraudulent concealment of their scheme to defraud prevented Allstate from discovering or asserting, until now, the foregoing fraud, or the injury resulting therefrom to Allstate.

247. Allstate has no obligation to pay for health care services allegedly rendered by individuals acting in the employ of a professional corporation and/or physician, where, as here, the services were not provided by properly licensed providers, the services billed were not provided, the services were not provided as billed, the services were provided by independent contractors, the services were provided pursuant to an illegal referral scheme, the claimed injuries did not exist, the claimed diagnoses were fictitious and not related to a covered accident, the claimed test results were fictitious, the submitted claims are fraudulent in nature, the services

were billed in violation of the fee schedule, the services were provided by entities and individuals that were not legally owned, controlled, and managed according to state licensing and operating requirements; and/or the services were provided as part of a scheme and pattern to bill unnecessary services in order to submit substantial fraudulent billing to Allstate.

248.  The Defendants knew the foregoing material misrepresentations to be false when made and made or facilitated these false representations with the intention and purpose of inducing Allstate to rely thereon.

249.  Allstate did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts that Allstate was led to believe existed as a result of the Defendants' acts of fraud and deception, and which led to Allstate making payments to the Defendants and incurring expenses as a result.

250.  Had Allstate known of the fraudulent content of the reports, the fraudulent nature of the diagnoses, the fictitious nature of the claimed injuries, the fictitious nature of the services that were represented to be provided, the referrals by financially related entities, the illegal kickbacks made to obtain referrals, the fact that the services had not been provided as billed, the fact that the fees billed were excessive and in violation of the law, the fact that the services had not been provided by licensed providers, the illegal operation, management, ownership, and lack of compliance with state licensing requirements of the Defendant health providers, and the fact that the services were provided by independent contractors, it would not have paid the Defendants' claims for No-Fault insurance benefits submitted in connection therewith.

251.  In reliance upon these false representations and/or omissions, during the six (6) years preceding this Complaint, Allstate has made payments to the Defendants and incurred additional costs totaling at least $1,185,299.17 as a result of the fraudulent billing.

252. Allstate was thus injured as a proximate result and is entitled to recover the payments it made to the Defendants. As a result of the fraud of the Defendants, Allstate should recover all of its payments and be reimbursed for the costs incurred as a result of the fraudulent billing.

253. Allstate also requests punitive damages in the amount of $1,000,000, plus interest.

## SECOND CLAIM FOR RELIEF

### (Unjust Enrichment)

### (Against All Defendants)

254. Allstate repeats and realleges the allegations set forth in paragraphs 1 through 253 of this Complaint with the same force and effect as if set forth fully herein.

255. By reason of their wrongdoing, the Defendants have been unjustly enriched, in that they have received monies from Allstate that are the result of unlawful conduct, and that in equity and good conscience, they should not be permitted to keep.

256. No contract exists between Allstate and the Defendants. Allstate is not asserting any ground for recovery that arises from any contract.

257. Allstate is therefore entitled to restitution from the Defendants in the amount by which the Defendants have been unjustly enriched.

## THIRD CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(c))
### (Association In Fact Enterprise)

### (Against All Defendants)

258.  Allstate repeats and realleges the allegations set forth in paragraphs 1 through 257 of this Complaint with the same force and effect as if set forth fully herein.

259. At all times relevant to this Complaint, the Defendants Kalitenko MD, Kalitenko PC, Poonawala, Vine, Stybel, Kenworthy, Mironovich, Grace, Headlam PC, NY Billing, ABC Corps. 1-6 and John Does 1-6 constituted a separate associated in fact enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "Associated In Fact Enterprise").  This enterprise was formed with the common purpose of engaging in fraudulent activities.

260.  At all times relevant to this Complaint, such Defendants were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c), with an existence separate and apart from the Associated In Fact Enterprise.

261.  The Defendants Kalitenko MD, Poonawala, Vine, Stybel, Kenworthy, Mironovich, Grace, Headlam PC, Kalitenko PC, NY Billing, ABC Corps. 1-6 and John Does 1-6 conducted or participated, directly or indirectly, in the conduct of the Associated In Fact Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).   The Defendant Mironovich was the owner of Entity Defendant NY Billing and participated in and enabled much of the fraudulent billing.  All of the Defendants enabled and/or controlled the billing of the health provider Defendants who regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients. All of the health provider Defendants enabled the fraudulent use of their names and licenses in

70

order to submit billing to Allstate and other insurers.  All of the Defendants enabled and/or controlled the reports of the health provider Defendants who regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided.  Substantial billing was mailed to Allstate on behalf of Vine, Kalitenko MD, Poonawala, Grace, and Headlam PC for TCD and vestibular testing services that were not provided as billed, that were not provided by Vine, Kalitenko MD, Poonawala, or the nominal physician owners of Grace or Headlam PC, and that were billed for using fictitious diagnoses.  Many of these tests were not administered at all.  The vestibular testing was, to the extent any services were actually provided, illegally performed by individuals who did not have credentials or qualifications in medicine and/or audiology.  This fraudulent billing was enabled by the provider Defendants Vine, Kalitenko MD, Poonawala, Grace, and Headlam PC, and by Mironovich, NY Billing, and the Joe Doe and ABC Corp. Defendants.  The Defendants Mironovich and NY Billing provided and directed many of the persons including laypersons who actually administered any purported health care services that were provided by the Defendants.  Each of the Defendants made and/or received improper referrals to financially related entities which is how they obtained patients which they used to bill the fraudulent services.  Each of the Defendants assisted and/or submitted the fraudulent billing. Each of the Defendants was aware that these claims would be sent to Allstate through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 & 1343:

> (a)      Such Defendants devised and executed a scheme and artifice to defraud Allstate of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

> (b)      Pursuant to the scheme, such Defendants submitted to Allstate false and fraudulent claims and information in that such Defendants concealed the

fact that the Defendants had financial relationships with their referring providers, and did not disclose these relationships;

(c)     Pursuant to the scheme, such Defendants misrepresented to Allstate that the Defendants Grace, Headlam PC, and Kalitenko PC were properly licensed and that the Defendants Kalitenko MD, Poonawala, Vine, Stybel and Kenworthy provided the services as billed in their names and licenses;

(d)     Pursuant to the scheme, such Defendants concealed from Allstate the fact that the services billed for were illegal self-referrals from providers that the Defendants had financial relationships with and did not disclose these relationships to its patients and obtain their consent;

(e)     Pursuant to the scheme, such Defendants submitted to Allstate false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(f)     Pursuant to the scheme, such Defendants submitted to Allstate false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(g)     Pursuant to the scheme, such Defendants submitted to Allstate false and fraudulent claims and information in that such Defendants falsely represented that the testing that the health provider Defendants billed for had been administered by the health provider Defendants and were medically necessary for the care of the patients;

(h)     Pursuant to the scheme, the Defendants submitted to Allstate false and fraudulent claims and information in that such Defendants falsely represented that the VNG and TCD tests were medically necessary when in fact virtually all of the VNG and TCD tests did not need to be provided at all and was not provided as billed;

(i)     For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to Allstate and others by use of the mail and interstate wire facilities and caused Allstate to make payments for said fraudulent claims by use of the mail and interstate wire facilities.  Each of the Defendants was aware that these claims would be sent to Allstate through the use of the mails and authorized the use of the mails to submit these claims.

262.  The Defendants have engaged in this scheme from at least as early as 2001 and continuing to the present day, and absent the requested relief from the Court, the fraudulent enterprise will continue to seek to submit and collect fraudulent No-Fault claims.  Every single claim submitted by the Defendants associated with this enterprise has been fraudulent.  This is a continuing illegal operation which has submitted numerous fraudulent claims to Allstate and other insurers.  Efforts continue to be made by the fraudulent enterprise to collect the illegal billing submitted to Allstate.

263.  The Defendants have mailed hundreds of false claims to Allstate, and a representative sample of such mailings is set forth in the factual section of this Complaint.

264.  The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e. the submission of the fraudulent bills to Allstate and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records and by negotiating and executing various lease agreements.

265.  By reason of such Defendants' violation of 18 U.S.C. § 1962(c), Allstate was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by Allstate and the costs of this suit, including reasonable attorneys' fees.  During the period of relevance to the allegations in this Complaint, Allstate has paid to these Defendants substantial claim amounts totaling at least $1,185,299.17.

266. The Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.  In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud.  This prevented Allstate from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to Allstate.

267. Allstate was damaged by this scheme in that payments were made to, or to others on behalf of, the Defendants Kalitenko, Poonawala, Vine, Stybel, Kenworthy, Grace and Headlam PC which would not have otherwise been made but for the fraudulent activities.

## FOURTH CLAIM FOR RELIEF

### (Violation of 18 U.S.C. §1962(d))
### (Conspiracy)

### (Against All Defendants)

268. Allstate repeats and realleges the allegations set forth in paragraphs 1 through 267 of this Complaint with the same force and effect as if set forth fully herein.

269. The Defendants Kalitenko MD, Poonawala, Vine, Stybel, Kenworthy, Mironovich, Grace, Headlam PC, Kalitenko PC, NY Billing, ABC Corps. 1-6, and John Does 1-6 have conspired with each other to violate 18 U.S.C. § 1962(c).

270. The Defendants Kalitenko MD, Poonawala, Vine, Stybel, Kenworthy, Mironovich, Grace, Headlam PC, Kalitenko PC, NY Billing, ABC Corps. 1-6, and John Does 1-6  each agreed to participate in a conspiracy to commit the RICO violation by agreeing to conduct the affairs of the Associated In Fact Enterprise by means of a pattern of racketeering activity, including numerous acts of mail and wire fraud as set forth herein, and through the preparation and/or submission of fraudulent claim documents to Allstate including billing services that were

not provided with fictitious test results, unnecessary services provided after fraudulent referrals from related entities and other services with false diagnoses which could have injured the patients if relied upon  and through the submission of supporting sham invoices and the preparation and/or submission of fraudulent claim documents to Allstate.

271.  The purpose of the conspiracy was to obtain No-Fault payments from Allstate based on sham invoices and fraudulent claim documents.  Each of the conspirators was aware of this goal and agreed to take part in facilitating it.

272. Allstate has been injured in its business and property by reason of this conspiratorial conduct, in that they have paid substantial insurance benefits as a result of the unlawful conduct.

273.  By virtue of this violation of 18 U.S.C. § 1962(d), the Defendants Kalitenko MD, Poonawala, Vine, Stybel, Kenworthy, Mironovich, Grace, Headlam PC, Kalitenko PC, NY Billing, ABC Corps. 1-6 and John Does 1-6 are jointly and severally liable to Allstate for three times the damages that Allstate has sustained, plus the costs of this suit, including reasonable attorneys' fees.

274.  The Defendants Kalitenko MD, Poonawala, Vine, Stybel, Kenworthy, Mironovich, Grace, Headlam PC, Kalitenko PC, NY Billing, ABC Corps. 1-6, and John Does 1-6 concealed their conspiratorial conduct, as well as their overall scheme to defraud, from Allstate through their misrepresentations and material omissions.  This prevented Allstate from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to Allstate.

## FIFTH CLAIM FOR RELIEF

### (New York Public Health Law § 238-a)

### (Against Defendants Kalitenko MD, Poonawala, Vine, Stybel, Kenworthy, Grace, Headlam PC, John Does 4-6, and ABC Corps. 4-6)

275.  Allstate repeats and realleges the allegations of paragraphs 1 through 274 of this Complaint with the same force and effect as if set forth fully herein.

276.  Section 238-a of the New York Public Health Law provides, in relevant part:

> 1.  (a) A practitioner authorized to order clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services may not make a referral for such services to a health care provider authorized to provide such services where such practitioner or immediate family member of such practitioner has a financial relationship with such health care provider.
>
> (b) A health care provider or a referring practitioner may not present or cause to be presented to any individual or third party payor, or other entity a claim, bill, or other demand for payment for clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services furnished pursuant to a referral prohibited by this subdivision.
>
> *       *       *
>
> 7.  If a referring practitioner or a health care provider furnishing clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services or any other person or entity, collects any amounts that were billed in violation of this section, such referring practitioner and health care provider and other person or entity shall be jointly and severally liable to the payor for any amounts so collected.

277.  The Defendants John Does 4-6 and ABC Corps. 4-6 are practitioners as that term is defined under Section 238(11) of the New York Public Health Law.

278.  The Defendants John Does 4-6 and ABC Corps. 4-6 regularly made referrals to the Defendants Kalitenko, Poonawala, Vine, Stybel, Kenworthy, Grace and Headlam, with which they had financial relationships, including referrals for x-ray or imaging services.

279. The Defendants Kalitenko, Poonawala, Vine, Stybel, Kenworthy, Grace and Headlam are "health care providers" as that term is defined under Section 238(6) of the New York Public Health Law.

280. The Defendants Kalitenko, Poonawala, Vine, Stybel, Kenworthy, Grace and Headlam had a "financial relationship" with the Defendants John Does 4-6 and ABC Corps. 4-6 as that term is defined under Section 238(3) of the New York Public Health Law, and routine referrals for x-ray or imaging services were made to the Defendants Kalitenko, Poonawala, Vine, Stybel, Kenworthy, Grace and Headlam for patients allegedly treated by John Does 4-6 and ABC Corps. 4-6.

281. The referrals by the Defendants John Does 4-6 and ABC Corps. 4-6 violate Section 238-a(1) and (9) of the New York Public Health Law.

282. In violation of Section 238-a(1)(b) of the New York Public Health Law, the Defendants Kalitenko, Poonawala, Vine, Stybel, Kenworthy, Grace and Headlam have presented or caused to be presented to Allstate claims for payment for x-ray or imaging services furnished pursuant to a prohibited referral.

283. Allstate has paid substantial amounts to the Defendants Kalitenko MD, Poonawala, Vine, Stybel, Kenworthy, Grace and Headlam for TCD ultrasound services billed in violation of Section 238-a of the Public Health Law and, pursuant to Section 238-a(7) of the Public Health Law, is entitled to recover such amounts from Defendants John Does 4-6, ABC Corps. 4-6, Kalitenko MD, Poonawala, Vine, Stybel, Kenworthy, Grace and Headlam which, as practitioners and as health care providers respectively, are jointly and severally liable to Allstate for the amounts received in violation of New York Public Health Law § 238-a. Allstate is also entitled

to an order declaring all amounts billed as violative of New York Public Health Law § 238-a and not eligible for payment.

## SIXTH CLAIM FOR RELIEF

### (Declaratory Judgment)

### (Against the Defendants Kalitenko, Poonawala, Vine, Stybel, Kenworthy, Grace and Headlam)

284.  Allstate repeats and realleges the allegations of paragraphs 1 through 283 of this Complaint with the same force and effect as if fully set forth herein.

285.  All of the Defendants made and/or received referrals from providers they had financial relationships with and did not properly disclose these relationships to the patients in violation of New York statutes.

286.  All of the Defendants submitted claims in violation of the fee schedules that were applicable in violation of New York.

287.  Bills were mailed to Allstate on behalf of the Defendants Vine, Poonawala, Kalitenko MD, Grace, and Headlam PC billed for TCD and vestibular testing services when no such fees should have been recoverable because the services were not performed properly or at all.

288.  The Defendant Kalitenko MD failed to properly submit proof of claim in violation of the policies and the No-Fault regulations.

289.  Kalitenko MD failed to verify his claims in violation of the policies and the No Fault regulations.

290.  Kalitenko MD failed to appear for an examination under oath (EUO) as requested by Allstate.

291.  Billing was submitted on behalf of the Defendants Vine, Poonawala, Kalitenko MD, Grace, and Headlam PC for the services of independent contractors, in violation of the No-Fault regulations.

292.  The Defendants Vine, Poonawala, Kalitenko MD, Grace, and Headlam PC billed for TCD and vestibular testing services that should have been but were not performed by a physician, audiologist, or other qualified professional.

293.  Each of the Defendants conspired to bill for services that were not provided as billed.

294.  The Defendants Grace, Kalitenko PC, and Headlam PC are sham professional entities secretly controlled by the Defendants John Does 1-3 and ABC Corps. 1-3, and they are not in fact owned and controlled by the doctors who are their nominal owners on paper.

295.  The provider Defendants and others on their behalf continue to submit to Allstate, and to seek to collect on, assigned No-Fault claims for the fraudulent services and billing described herein.

296.  Allstate has and will be prejudiced without a judicial declaration that the Defendants are not entitled to payment of assigned first-party No-Fault benefits in any claims from Allstate due to:  (1) the Defendants' financial relationship with their referring providers in violation of Public Health Law §§ 238-a and/or 238-d; (2) the Defendants' failure to disclose their financial relationship with their referring providers to their patients pursuant to Public Health Law §238-d; (3) billing on behalf of the Defendants Kalitenko MD, Poonawala, Vine, Stybel, Kenworthy, Grace, Headlam PC, and Kalitenko PC for medical services that were not provided by the physicians named on their bills; (4) the billing of vestibular testing services including VNG by Vine, Poonawala, Kalitenko MD, Grace, and Headlam PC that were required

to be performed but were not performed by qualified professionals including doctors or audiologists; (5) the violations of the Fee Schedule by all Defendant health providers; (6) the failure of the Defendant Kalitenko MD to provide proof of claim in accordance with the policy and the No Fault Regulations; (7) the failure of Kalitenko MD to verify their claims in accordance with the policy and the No Fault Regulations; (8) the failure of Kalitenko MD to appear for examinations under oath (EUOs) requested by Allstate; (9) the billing of health care services by Defendants Grace, Kalitenko PC, and Headlam PC when they are sham professional entities; and (10) the billing of medical services by the Defendants Kalitenko MD, Poonawala, Vine, Stybel, Kenworthy, Grace, Headlam PC, and Kalitenko PC when the services were provided, if at all, by independent contractors.

297. There exists a real, actual and justiciable controversy between Allstate and the Defendants.

298. Allstate has no adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF

### (Permanent Injunctive Relief)

### (Against All Defendants)

299. Allstate repeats and realleges the allegations set forth in paragraphs 1 through 298 of this Complaint with the same force and effect as if set forth fully herein.

300. This is an actual case and controversy between the Defendants and Allstate regarding at least $3,271,923.05 in unpaid billing for the fraudulent insurance claims that have been submitted to Allstate.

301.  All of the Defendants who have billed Allstate for these insurance claims have no right to receive payment from Allstate on the unpaid billing because of the fraudulent and unlawful billing detailed herein.

302.  Accordingly, Allstate requests that the Court permanently enjoin the Defendants from seeking payment for any pending bills in the name of the Defendants Kalitenko, Poonawala, Vine, Stybel, Kenworthy, Grace and Headlam PC submitted to Allstate.

**WHEREFORE**, Allstate demand Judgments against the Defendants named in each Claim for Relief, jointly and severally, as follows:

(a)  On Allstate's First Claim For Relief for fraud, the damages that Plaintiffs have sustained as a result of the Defendants' conduct which are in excess of $1,185,299.17, the exact amount to be determined at trial, plus one million dollars ($1,000,00.00) punitive damages, plus a declaratory judgment decreeing that Allstate has no obligation to pay pending No-Fault claims submitted by the Defendants;

(b)  On Allstate's Second Claim For Relief for unjust enrichment, the amount by which the Defendants were unjustly enriched, the exact amount to be determined at trial;

(c)  On Allstate's Third and Fourth Claims For Relief under RICO, three (3) times the damages that Allstate has sustained as a result of the improper conduct which are in excess of $1,185,299.17, or $3,555,897.51, the exact amount to be determined at trial, plus Allstate's costs in this suit, including reasonable attorneys' fees;

(d)  On Allstate's Fifth Claim For Relief, under Section 238-a of the New York Public Health Law, the damages that Plaintiffs have sustained as a result of the Defendants' conduct, the exact amount to be determined at trial;

(e)  On Allstate's Sixth Claim For Relief, a declaratory judgment decreeing that Allstate has no obligation to pay pending or future No-Fault claims submitted by the Defendants; and

(f)  On Allstate's Seventh Claim For Relief, a permanent injunction decreeing that Allstate has no obligation to pay pending No-Fault bills submitted by the Defendants, and permanently enjoining the Defendants from seeking payment on such claims.

Dated:  October 30, 2023
        New York, New York

**SHORT & BILLY, P.C.**

By:  _____
        Andrew S. Midgett
        Skip Short
        217 Broadway Suite 300
        New York, New York 10007
        (212) 732-3320


        _____/s/ Vincent Gerbino_____
        Vincent Gerbino
        Bruno, Gerbino, Soriano & Aitken, LLP
        445 Broad Hollow Road, Suite 420
        Melville, New York 11747
        (631) 390-0010


        *Attorneys for Allstate*